[S.F. No. 24323. Feb. 18, 1982.]

RESERVE INSURANCE COMPANY, Plaintiff, Cross-defendant
and Appellant, v.
JOHN PISCIOTTA, Defendant, Cross-complainant and Appellant;
TYLER PHILIP CAMPBELL et al., Defendants and Respondents;
CNA INSURANCE GROUP, Cross-defendant and Appellant;
ERNIE C. BUSCH, Cross-complainant and Appellant.

**COUNSEL**

William W. Schofield, John A. Reding and Crosby, Heafey, Roach & May for Plaintiff, Cross-defendant and Appellant.

O. J. Ramsey, Ramsey, Morrison & Keddy and Arne Werchick for Defendant, Cross-complainant and Appellant.

Porter, Scott, Weiberg & Delehant, Rick V. Battershell and A. Irving Scott for Cross-defendant and Appellant.

Bronson, Bronson & McKinnon, Grant P. Dubois and David W. Gordon for Cross-complainant and Appellant.

Diepenbrock, Wulff, Plant & Hannegan and John S. Gilmore for Defendants and Respondents.

**OPINION**

**MOSK, J.**—This is an appeal from a declaratory judgment action filed by Reserve Insurance Company, which sought a determination that a "family member" exclusion in its policy applies to the stepson of the insured. The case raises a number of interrelated issues concerning the potential liabilities of the insured, his broker, Reserve, and an excess insurer for the damages resulting from injuries to the stepson.

Tyler Campbell is the son of Dita Pisciotta and her former husband. After Dita remarried, she and Tyler took up residence with her new husband, John Pisciotta. From that time forward, Pisciotta treated Tyler and his brother as if they were his natural children: he provided funds for their support and shared responsibility for their upbringing. On June 26, 1976, Tyler was a passenger in a speedboat owned and driven by John Pisciotta, and was seriously injured when the boat collided with another.

Until May 11, 1976, Pisciotta's boat was covered by two watercraft liability policies, both obtained through his insurance broker, Ernie Busch. United States Fidelity and Guaranty Company (USF&G) provided primary coverage with a single limit of $300,000 per occurrence; the USF&G policy contained no family member exclusion. CNA Insurance Group (CNA) provided "excess" or "umbrella" coverage to supplement the USF&G policy.

The CNA policy was mainly designed to cover liability incurred by Pisciotta in excess of the limits of the "underlying insurance." At the time it was written, the "underlying insurance" was the USF&G policy. The CNA policy also contained a clause which required the insured to maintain underlying coverage "not more restrictive" than the USF&G policy. If Pisciotta breached this maintenance clause, CNA obligated itself to cover him only "to the same extent had the insured complied with this section."

May 11 was the expiration date for the primary policy. Pisciotta and Busch discussed the possibility of obtaining replacement coverage, but Pisciotta elected to allow the USF&G policy to lapse because he planned to sell his boat. The CNA policy remained in effect. When Pisciotta later decided to take a weekend boating trip with his wife and two stepsons, he arranged at the last minute for Busch to obtain re-

placement primary coverage. Busch complied, the policy becoming effective on June 26, the very day of Tyler's injury.

The replacement policy which Busch procured was issued by Reserve Insurance Company (Reserve) and differed in two significant respects from the original primary policy: first, it contained a family member exclusion; second, it provided split limit coverage instead of the single limit coverage of the USF&G policy. The Reserve policy limits were $100,000 per occurrence for the injury to one person and $300,000 per occurrence for injuries to more than one person.

Following the accident, Tyler—through a guardian ad litem—filed a complaint for damages against his stepfather and the driver of the other boat. Reserve then filed a declaratory judgment action seeking a ruling that the family member exclusion in its policy applied to Tyler so that Reserve would not be required to indemnify Pisciotta for his liability resulting from Tyler's injuries. Pisciotta responded with a cross-complaint seeking alternative declarations as follows: if the exclusion did not apply and Reserve was consequently required to provide $100,000 of primary coverage, either CNA or Busch was responsible for any liability of Pisciotta from $100,000 up to $300,000; if the exclusion did apply, Busch was responsible for any liability up to $300,000 because of his negligence in procuring a replacement policy containing the family exclusion. CNA did not dispute that it provided coverage for any liability in excess of $300,000.

The trial court found the exclusion to be ambiguous when applied to Tyler. It therefore interpreted the exclusion in Pisciotta's favor, concluding that Reserve was required to provide coverage up to its policy limit of $100,000.

A jury found that both Busch and Pisciotta were negligent in obtaining a replacement policy with coverage of only $100,000 per person injured; Busch was found to be 75 percent at fault, Pisciotta 25 percent at fault. Busch was accordingly declared responsible for $150,000 of the resultant gap in coverage between $100,000 and $300,000. The jury, however, found that Busch was not negligent in obtaining a replacement policy containing a family exclusion. Inexplicably, the trial court ruled that CNA would have to indemnify Pisciotta for his 25 percent of responsibility for the $200,000 gap in coverage. All parties appealed from the judgment.

I

LIABILITY OF RESERVE

The pertinent provisions of the Reserve policy are as follows: "The Company will pay on behalf of an insured all damages which the insured becomes legally obligated to pay because of bodily injury or property damage arising out of the ownership, maintenance or use of [Pisciotta's boat] .... This section does not apply: ... to bodily injury to the insured or to any member of the family of the insured residing in the same household as the insured."[1]

■ At the outset, we must decide whether the language of the exclusion is sufficiently definite to exclude Tyler as a member of Pisciotta's "family." Because we conclude that it is not, the exclusion is inapplicable.

We begin with established principles applicable to the interpretation of insurance policies. ■ Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. (Civ. Code, § 1638; *Pacific Employers Ins. Co. v. Maryland Casualty Co.* (1966) 65 Cal.2d 318, 323 [54 Cal.Rptr. 385, 419 P.2d 641], disapproved on another point in *Herzog v. National American Ins. Co.* (1970) 2 Cal.3d 192, 199 [84 Cal.Rptr. 705, 465 P.2d 841]; see also *California State Auto. Assn. Inter-Ins. Bureau v. Hoffman* (1978) 77 Cal.App.3d 768, 775 [143 Cal.Rptr. 835]; *Farmers Ins. Exch. v. Harmon* (1974) 42 Cal.App.3d 805, 809 [117 Cal.Rptr. 117].)

■ On the other hand, "any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and ... if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insur-

---

[1] We recently upheld the family exclusion clause used in an automobile liability policy, rejecting challenges based on equal protection and public policy grounds. (*Farmers Ins. Exchange v. Cocking* (1981) 29 Cal.3d 383 [173 Cal.Rptr. 846, 628 P.2d 1].) We stated: "The primary basis underlying the use of this exclusion has been well described in a recent Indiana case: '[T]he concept of a household exclusion is a common one which has long enjoyed judicial support. Its purpose is to prevent suspect inter-family legal actions which may not be truly adversary and over which the insurer has little or no control. Such an exclusion is a natural target for the insurer's protection from collusive assertions of liability.... [Citation.]'" (*Id.* at p. 389.)

ance relates." (*Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal.Rptr. 133, 493 P.2d 861]; see also *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914].) The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy. (*Century Bank* v. *St. Paul Fire & Marine Ins. Co.* (1971) 4 Cal.3d 319, 321 [93 Cal.Rptr. 569, 482 P.2d 193]; *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at pp. 269-270; *Atlantic Nat. Ins. Co.* v. *Armstrong* (1966) 65 Cal.2d 100, 112 [52 Cal.Rptr. 569, 416 P.2d 801].) Its effect differs, depending on whether the language to be construed is found in a clause providing coverage or in one limiting coverage. ■ "Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured [citations], exclusionary clauses are interpreted narrowly against the insurer. [Citations.]" (*State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 101-102 [109 Cal.Rptr. 811, 514 P.2d 123]; accord, *Tencza* v. *Aetna Casualty & Surety Company* (1974) 21 Ariz.App. 552 [521 P.2d 1010, 1012-1013].) "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again, 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect' [citation]; thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.' [Citation.]" (*State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 201-202 [110 Cal.Rptr. 1, 514 P.2d 953].)

■ The interpretation of the word "family" as used in the Reserve policy turns on whether that word is ambiguous with reference to a stepson of the insured. If ambiguous, settled principles dictate that the term be construed against Reserve and in favor of coverage.

There are no California cases directly on point. *Moore S. Corp.* v. *Industrial Acc. Com.* (1921) 185 Cal. 200 [196 P. 257, 13 A.L.R. 676], cited by Reserve, is inapposite. *Moore* interpreted a workers' compensation law which provided benefits to members of the "family or household" of injured employees; it held that the daughter of a woman cohabiting with the injured employee was entitled to benefits as a member of his "family." The court was not reviewing a private insurance contract and merely adopted an expansive definition of the word "family" in order to effectuate the purposes of the statute.

Two cases in other jurisdictions have held that the family member exclusion does apply to stepchildren. Both interpreted exclusions worded similarly to the Reserve policy's exclusion. In *Zipperer* v. *State Farm Mutual Automobile Ins. Co.* (5th Cir. 1958) 254 F.2d 853, 855, the court excluded coverage for the insured's stepson without discussing whether the stepson was a "member of the family of the insured." In *LeRoux* v. *Edmundson* (1967) 276 Minn. 120 [148 N.W.2d 812], the two stepdaughters of Edmundson were injured in an automobile accident while he was driving. Edmundson's insurer invoked its family member exclusion to avoid indemnifying Edmundson for the injuries to his stepdaughters. The *LeRoux* court first looked to the factual details of the relationship between Edmundson and his stepdaughters and concluded that it closely approximated the relationship between a parent and his natural children. The court then considered the purpose of the exclusionary clause—to exempt the insurer from liability to insureds likely to be partial to the injured party because of the close ties commonly existing among family members residing together—and attempted to fulfill that purpose by holding that stepchildren are within the scope of the word "family."

When confronted with standardized provisions in a form insurance contract, the primary focus of our inquiry is on the reasonable expectations of the insured at the time he purchased the coverage. The ordinary expectation of one who purchases liability insurance is that he will be covered for any liabilities incurred as a result of the activity to which the policy relates. The insurance company's obligation to provide coverage can be limited only by exclusions phrased in language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided. The *LeRoux* court erred in relying heavily on the particular facts of the case evidencing a close relationship between the father and his stepchildren at the time of trial. Such factual analysis diverted the court's focus away from the essential issue of whether the insured could reasonably have been expected to know at the time he obtained coverage whether his stepchildren would be excluded. Furthermore, the analysis left open the possibility that the same clause, when applied to a different—e.g., a cool or distant—stepchild-stepparent relationship, might yield a different result.

*LeRoux* also considered the purpose of the family exclusion as an aid to interpretation of the word "family," correctly discerning the probable intent of the insurance company in inserting that clause into its policies.

However, courts are unable to effectuate that intent unless the insurer chooses language which is clearly adequate to inform the insured of the precise restrictions it intends to place on the scope of the policy's coverage.[2]

Turning to the facts of the case at bar, we have little doubt that the evidence presented at trial shows the relationship between Tyler Campbell and John Pisciotta was close. But that fact is not determinative. Before we can conclude that Pisciotta is not covered for liability to Tyler, we must be able to state with some certainty that the language of the Reserve exclusion was sufficiently clear to inform a reasonable insured in Pisciotta's position that the exclusion would apply to his stepson.[3]

The various dictionary definitions of the word "family" illustrate the wide range of meanings which may be attributed to the word. For example, the Oxford English Dictionary contains these definitions: "2. The body of persons who live in one house or under one head, including parents, children, servants, etc. . . . 3. The group of persons consisting of the parents and their children, whether actually living together or not; in a wider sense, the unity formed by those who are nearly connected by blood or affinity. . . . 4. Those descended or claiming descent from a common ancestor." (6 Oxford Eng. Dict. (1933) p. 55.) In *State Farm Mutual Automobile Ins. Co.* v. *Thompson* (9th Cir. 1967) 372 F.2d 256, 258, the court held that a putative spouse was not a member of the insured's family, stating: "The term 'family,' which is not defined

---

[2] We note that Reserve could easily have clarified the intended scope of its exclusion by defining the word "family." In *United Pacific Insurance Company* v. *McCarthy* (1976) 15 Wash.App. 70 [546 P.2d 1226, 1227-1228], a similar provision excluded coverage for bodily injury to persons related by "blood, marriage or adoption" to the insured. The court found that no ambiguity existed with regard to the insured and his stepson since they were obviously related "by marriage."

[3] Reserve cites portions of the reporter's transcript in which Pisciotta testified that had he been aware of the presence of the family member exclusion in his policy, he would not have taken his stepson on the boating trip. We interpret his testimony as indicating no more than that the exclusion's wording would have created uncertainty in Pisciotta's mind as to whether Tyler would be excluded under the policy.

It is not significant that Pisciotta did not actually read the Reserve policy before Tyler's accident. We must presume for the sake of analysis that Pisciotta was at least generally aware of the policy terms. A different approach, focussing on whether a particular insured has read his policy, could conceivably allow an insured to escape the consequences of the insurance agreement he has entered into merely by claiming ignorance of its terms.

in the policy, is at best imprecise and having in view the possible meanings which may be given to it, may fairly be said to be ambiguous."

Our function is not to select one particular definition of family, but rather to imply from among the range of reasonable meanings the definition which most favors coverage for the insured. We conclude that a reasonable insured could have believed that the term "family" did not encompass his stepchildren. Our conclusion is bolstered by the fact that Reserve used the word "household" in a conjunctive sense with "family."[4] The use of both terms raises the inference that they were not intended to be synonymous. The term "household" may encompass a group of totally unrelated yet mutually interdependent individuals residing in close physical proximity to one another. "Family," however, connotes a proximity of relationship apart from cohabitation. (See *Hicks v. Hatem* (1972) 265 Md.App. 260 [289 A.2d 325, 328].)

This case presents two well-balanced sets of countervailing factors. On the one hand, a married person may regard his stepchildren as part of his family. Additionally, most decisions from other jurisdictions have interpreted the family member exclusion to extend beyond blood relationships, following analyses similar to that of *LeRoux*. (See, e.g., *Perry v. Southern Farm Bureau Casualty Ins. Co.* (1965) 251 Miss. 544 [170 So.2d 628] (mother-in-law); *Hunter v. Southern Farm Bureau Casualty Ins. Co.* (1962) 241 S.C. 446 [129 S.E.2d 59] (meretricious spouse); *Third National Bank v. State Farm Mut. Auto. Ins. Co.* (Ky. 1960) 334 S.W.2d 261 (sister-in-law).) On the other hand, our past decisions have consistently embraced the notion that ambiguities in an insurance policy are to be strictly construed against the insurer. This rule applies with particular impact to the text of exclusions. Because the word "family" is susceptible of several reasonable definitions, the most appropriate resolution is to construe the term narrowly, i.e., in favor of the insured. In this manner, we formulate a clearcut rule which avoids the uncertainty engendered in ad hoc factual determinations of whether particular stepparents and their stepchildren have a close, personal and affectionate enough relationship to be considered members of the same family. A different result would rescue a draftsman from the consequences of the imprecise terminology he has chosen and potentially defeat the reasonable expectations of the insured.

---

[4] The exclusion states: "This section does not apply: . . . to bodily injury to the insured or to any member of the family of the insured residing in the same household as the insured."

## II

### LIABILITY OF CNA

■ CNA admits that its policy provides coverage over the $300,000 level. We must decide to what extent CNA covers Pisciotta below that level. The coverage provisions of the CNA policy state: "Section II . . . . The Company [CNA] shall only be liable for the ultimate net loss in excess of either: . . . 1. the amount recoverable under the underlying insurance as set out in the schedule of the underlying insurance; or 2. 20% of the ultimate net loss or $200 ultimate net loss whichever is lesser in respect of each occurrence not covered by said underlying insurance." The "underlying insurance" listed in the "schedule of underlying insurance" is the USF&G policy. The two coverage provisions, when read together, make the CNA policy applicable either as excess insurance over any "amounts recoverable" under the primary policy or as alternative primary coverage as to losses "not covered by" the primary policy.

In the normal situation, such an excess policy would fill any gaps in coverage left open by the primary coverage in addition to increasing the total possible recovery by the insured. At the time Tyler was injured, however, the "underlying insurance" referred to in the CNA policy had lapsed and been replaced by the Reserve policy with its lower single-injury limit of $100,000. By procuring a replacement policy with a lower limit than that of the original primary policy, Pisciotta clearly breached the "maintenance clause" of the CNA policy.[5]

The plain import of the maintenance clause is that CNA refuses to allow the insured to expand the scope of CNA's exposure by replacing

---

[5]"The policy or policies referred to in the 'Schedule of the Underlying Insurance,' and renewals or replacements thereof not more restrictive, shall be maintained by the Named Insured without alteration of terms or conditions in full effect during the currency of this Section II . . . . Failure of the Named Insured to comply with the foregoing shall not invalidate this Section II but, in the event of such failure, the Company shall only be liable to the same extent had the named Insured complied with this condition."

Pisciotta weakly argues that the maintenance clause is ineffective either because it is ambiguous or because it is inconspicuously located in the policy. Neither of these contentions is persuasive. The clause is not ambiguous; it required Pisciotta to maintain underlying coverage "not more restrictive" than the USF&G policy. He plainly breached the clause by replacing the USF&G policy with a policy having lower limits. The clause was not inconspicuously located; it was placed under the heading "CONDITIONS" and labeled in boldface type: "Maintenance of Underlying Insurance."

the original primary policy with a second policy containing a narrower scope of coverage. Pisciotta's failure to comply with the maintenance clause created a gap in coverage between his primary and excess policies. Thus CNA is not responsible for any liabilities of Pisciotta between $100,000 and $300,000. The trial court therefore erred in requiring CNA to indemnify Pisciotta for his 25 percent responsibility for the coverage gap.

■ Pisciotta also contends that the postjudgment insolvency of Reserve causes the CNA coverage to apply over the "amount recoverable" under the Reserve policy, which may now be zero.[6] Before addressing this issue, we must first determine whether it is proper to consider the fact of Reserve's insolvency in deciding this appeal. It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered. (*People's Home Sav. Bank* v. *Sadler* (1905) 1 Cal.App. 189, 193 [81 P. 1029].) This rule preserves an orderly system of appellate procedure by preventing litigants from circumventing the normal sequence of litigation. However, the rule is somewhat flexible; courts have not hesitated to consider postjudgment events when legislative changes have occurred subsequent to a judgment (*Complete Serv. Bur.* v. *San Diego Med. Soc.* (1954) 43 Cal.2d 201, 207 [272 P.2d 497]; *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972]) or when subsequent events have caused issues to become moot (*Estate of Henry* (1960) 181 Cal.App.2d 173, 176 [5 Cal.Rptr. 582] [death of a party abated a nonsurvivable cause of action]).

Under the circumstances of this case, we deem it appropriate to consider Reserve's insolvency; because the fact is not in dispute, we do not usurp the fact-finding function of the trial court. A prompt determination by us avoids the necessity for repetitive litigation of issues that have been fully briefed. Furthermore, the court records regarding Reserve's insolvency would properly be the subject of judicial notice. (Evid. Code, § 452, subd. (d)(1).)

■ Pisciotta has cited two cases to support his contention that an excess insurer bears the risk of a primary insurer's insolvency: *Fageol*

[6] The record reveals that on May 29, 1979, less than a month after entry of judgment, an Illinois court determined that Reserve was insolvent. The next day, the Los Angeles Superior Court appointed the California Insurance Commissioner to be conservator for Reserve, authorizing the commissioner to conduct Reserve's affairs.

*T. & C. Co.* v. *Pacific Indemnity Co.* (1941) 18 Cal.2d 748 [117 P.2d 669], and *McConnell* v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637 [16 Cal.Rptr. 362, 365 P.2d 418]. In *Fageol*, the insured obtained a primary insurance policy which provided: "This insurance shall be considered as excess insurance where any specific insurance exists in the name of or for the benefit of the assured . . . and this insurance shall not apply nor contribute to the payment of any loss until any such specific insurance shall have been exhausted." The insured later obtained a second primary policy. The second insured became insolvent before entry of judgment. Relying on the language of the excess coverage provision and the fact that the first policy was purchased as primary insurance, the *Fageol* court reasoned that the first policy reverted to primary coverage upon the insolvency of the second insurer. (*Fageol, supra*, 18 Cal.2d at pp. 751-752.) In *McConnell*, there were three applicable policies: Interstate Indemnity Company issued a primary policy; Underwriters at Lloyds of London issued a primary and an excess policy. Interstate became insolvent after the loss occurred. The *McConnell* court—without analysis—declared: "[I]t is noted that insolvency of a primary insurer gives rise to liability under the excess policy, after, of course, any other primary coverage has been exhausted [citing *Fageol*]." (*McConnell, supra*, 56 Cal.2d at p. 646.)

■ Insofar as *McConnell* implies that an excess insurer is always obligated to bear the risk of a primary insurer's insolvency, regardless of express exclusions of that risk, that decision appears unsupportable.[7] It is axiomatic that absent a violation of public policy, a statute, or a constitutional provision, the parties to a private agreement may allocate risks in any manner they may choose. For this reason, we do not base our decision on the broadly stated holding of *McConnell*. ■ Rather, we follow the sound reasoning of *Fageol* and ask whether the wording of the CNA policy requires CNA to provide the coverage that Reserve would have assumed had it not become insolvent. CNA as-

---

[7]We note that *Fageol* and *McConnell* were decided before the enactment of legislation creating the California Insurance Guarantee Association. (See Ins. Code, § 1063 et seq.) CIGA is a mandatory organization of California insurers. Its primary function is to provide funds for satisfying claims against insolvent insurers. Since we hold that the CNA policy covers the risk of Reserve's insolvency, the protection of CIGA is not invoked. CIGA covers only claims which are not covered by other private insurance. (Ins. Code, §§ 1063.2, subd. (a), 1063.1, subd. (c)(7)(a).) "The Legislature [in creating CIGA] chose to provide a limited form of protection for the public, not a fund for the protection of other insurance companies from the insolvencies of fellow members." (*California Union Ins. Co.* v. *Central National Ins. Co.* (1981) 117 Cal.App.3d 729, 734 [173 Cal.Rptr. 35].)

sumed liability for any excess over the "amount recoverable" under the underlying policy. That language might possibly be interpreted either to expose CNA only for amounts over the dollar limits of the underlying insurance or to expose CNA for amounts which the insured is not able to actually recover from the underlying insurer because of its insolvency. Because there are two meanings which may reasonably be attributed to the term in question, it is ambiguous and under settled principles must be construed in favor of the insured. Reserve is now insolvent, so the "amount recoverable" from Reserve is something substantially less than the Reserve policy limit of $100,000. We therefore conclude that the CNA policy includes the risk of Reserve's insolvency within the scope of its coverage;[8] CNA must reimburse Pisciotta for the first $100,000 of his liability in addition to any amounts over $300,000.

CNA argues that imposing liability upon it due to Reserve's insolvency puts CNA in a worse position than if Pisciotta had not obtained any replacement coverage at all. Although this is accurate, it does not follow that CNA is being treated unfairly. The CNA policy, as we have interpreted it, covered the risk of the primary insurer's insolvency. If Pisciotta had fully complied with the maintenance clause of the CNA policy by purchasing replacement primary coverage as broad as the USF&G policy and if the replacement primary insurer had then become insolvent, CNA would have been required to cover Pisciotta from zero up to $300,000. Since Pisciotta partially breached the maintenance clause by purchasing replacement coverage with lower limits, CNA is only exposed from zero up to $100,000 due to Reserve's insolvency. True, if Pisciotta had obtained no replacement coverage whatsoever, CNA would have had no exposure beneath the $300,000 level. But that hypothetical situation did not occur. Pisciotta only partially breached the maintenance clause; his breach therefore only partially reduced CNA's exposure to the risk of the primary insurer's insolvency.

Pisciotta, on the other hand, urges us to find CNA responsible for his entire liability. His argument is based on the wording of CNA's mainte-

---

[8]In one case cited by CNA, an excess insurer escaped liability when the primary insurer became insolvent. (*Molina* v. *United States Fire Ins. Co.* (4th Cir. 1978) 574 F.2d 1176.) *Molina* is distinguishable from the present case on two grounds: (1) the policy in *Molina* contained a maintenance clause which required the insured to maintain "collectible" primary insurance; and (2) the policy only provided coverage for the "ultimate net loss in excess of the retained limit which the insured shall become legally obligated to pay." The "retained limit" was defined by reference to a specific dollar amount. These provisions, held the court, were sufficient to shift the burden of the primary insurer's insolvency from the excess insurer to the insured.

nance clause. As discussed above, the clause declares that if the insured breaches it, CNA provides only the coverage it would have if the insured had complied with the clause. Pisciotta first argues that had he complied with the maintenance clause and obtained replacement primary coverage of $300,000, CNA would by virtue of Reserve's insolvency have incurred full liability below the $300,000 level. The same result, he continues, should obtain even though Pisciotta did breach the clause by purchasing a replacement policy with a limit of $100,000. Therefore, he concludes, he is covered by CNA as if he had complied with the maintenance clause, i.e., up to $300,000. This artful reasoning distorts the clear meaning of the maintenance clause, which was inserted into the CNA policy to *limit* the company's liability in case the insured replaced the primary policy with one affording narrower coverage. It cannot be employed to *expand* the scope of CNA's liability. (*Pacific Employers Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.2d 318, 323.) CNA's liability is confined to amounts up to $100,000 and amounts in excess of $300,000.

## III

### LIABILITY OF BUSCH

■ Busch challenges the sufficiency of the evidence supporting the jury's finding that he was negligent in procuring a replacement primary policy containing lower limits than those found in the USF&G policy. "[W]hen a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

The evidence of Busch's negligence in obtaining only $100,000 of coverage is apparent. Busch testified that he was a qualified broker with 20 years' experience, that he understood his duty to inform Pisciotta of any coverage problems, and that he failed to review Pisciotta's file before obtaining coverage on the day of the accident. Busch informed Pisciotta of the alternative insurance and of the fact that the new policy would have the split limit coverage. Pisciotta was not told, however, that this coverage differed from the USF&G insurance or that the CNA excess policy required him to maintain underlying coverage of $300,000. Although Busch fully realized that if Pisciotta obtained the new primary policy, a gap in coverage would be possible, he never alert-

ed Pisciotta to that potentiality. This evidence is sufficient to sustain the jury's verdict. Therefore, since Busch was found to be 75 percent responsible for the $200,000 gap in coverage, he is liable in the amount of $150,000.

■ The trial court awarded $3,400 in attorney's fees to Pisciotta against Busch. As a general rule, the party who employs an attorney is responsible for paying his fees. "[A]ttorney's fees are not recoverable from the opposing party in the absence of an express statutory provision or a contractual agreement that they be paid." (*Reid* v. *Valley Restaurants, Inc.* (1957) 48 Cal.2d 606, 610 [310 P.2d 473]; Code Civ. Proc., § 1021.)

However, there are several judicially created exceptions to the general rule. Pisciotta apparently relies on the third-party tort exception: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645]; but cf. *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 6-8 [148 Cal.Rptr. 419, 582 P.2d 1010].) Pisciotta contends the fee award in his favor was a proper item of damages for his expenses incurred either in defending against the Reserve action or in pursuing his counterclaim against CNA. We find his argument unpersuasive. The jury found that Busch was not negligent in obtaining a policy containing a family exclusion. Since Reserve's declaratory judgment action against Pisciotta was based entirely on the exclusion, no negligent act of Busch caused that suit. Neither can attorney's fees be awarded on the basis of the unsuccessful counterclaim against CNA which sought coverage for the gap between the Reserve and CNA policies.

We have carefully reviewed the other contentions advanced by the parties and found them to be without merit.

## CONCLUSION

For the reasons stated, the judgment is modified to provide that (1) CNA must indemnify John Pisciotta for the first $100,000 of his liability; (2) CNA need not indemnify Pisciotta for his liability for any amount of damages in excess of $100,000 but less than $300,000; and

(3) Pisciotta is not entitled to an award of attorney's fees against Busch; and, as modified, the judgment is affirmed. All parties shall bear their own costs on appeal.

Bird, C. J., Newman, J., Kaus, J., Broussard, J., and Tobriner, J.,* concurred.

**RICHARDSON, J.**—I concur in part, and respectfully dissent in part.

## LIABILITY OF BUSCH

I fully concur in the majority's analysis of the liability of defendant Busch.

## THE RESERVE POLICY

I am unable to agree with my colleagues' construction of the primary policy issued by Reserve to Pisciotta. The majority insists that "Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them." (*Ante*, p. 807.) Adopting such an interpretative approach, I conclude that Tyler was a "member of the family of the insured residing in the same household as the insured," and thus was excluded from coverage under the Reserve policy. Tyler lived with his mother, his brother, and his stepfather, the insured Pisciotta, and was fully supported by Pisciotta. In the words of the majority, the insured "treated" (*ante*, p. 805) him as if he was a natural child. He lived in the "same household as the insured," Pisciotta. The record before us strongly suggests that Pisciotta, his wife (Tyler's mother), and Tyler himself considered Tyler to be, in every sense, a member of Pisciotta's "family." Within their several functions, I would expect that the federal census, Internal Revenue Service, public schools, Department of Motor Vehicles, the military draft, etc. would similarly treat Tyler as a "member" of Pisciotta's family.

While the majority insists that "Courts will not adopt a strained or absurd interpretation" to create an "ambiguity" (*ante*, p. 807), the consequences of its analysis are unusual. If the following persons, all living together in Pisciotta's "household," were injured in the same boat accident, the majority would interpret his Reserve insurance coverage to

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

exclude his wife, his son and an adopted son, but not to exclude his stepson. This seems to me to be a "strained" interpretation, and an artificial and unnatural result. It surely is not consistent with the reasonable coverage expectations of the insured or his family. In the absence of contrary evidence, there is no basis upon which to conclude that Pisciotta distinguished Tyler from the other members of his household, whom he also supported; and it is unreasonable to assume that Pisciotta contemplated a differential in insurance coverage among those members which, for example, would exclude his wife, but not her son.

In short, I find no ambiguity upon which to predicate differential insurance exposure. I think that the average layman would interpret the plain meaning of the term "family" in the Reserve policy to include Tyler. Accordingly, he is among those expressly excluded from coverage.

### THE CNA POLICY

A conclusion that Tyler was a member of Pisciotta's "family" in every reasonable sense relevant to the contract of insurance between Reserve and Pisciotta, however, neither adds to nor detracts from CNA's contractual obligations under its excess insurance policy. For "An insurance policy is but a contract; and, like all other contracts, it must be construed from the language used, .... The courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." (*Farmers Ins. Exch.* v. *Harmon* (1974) 42 Cal.App.3d 805, 809 [117 Cal.Rptr. 117].) While fundamental, it bears repeating that "The whole of a contract is to be taken together, so as to give effect to every part ..." (Civ. Code, § 1641), and that the overriding goal of all contractual interpretation is to carry out the intentions of the contracting parties. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed *at the time of contracting*, so far as the same is ascertainable and lawful." (*Id.*, § 1636, italics added.)

What were the mutual obligations undertaken by the parties in the contract of insurance between CNA and Pisciotta? As the majority acknowledges, the CNA policy was "designed to cover liability incurred by Pisciotta in excess of the limits of the 'underlying insurance'" in effect at the time the CNA insurance contract was entered into. (*Ante*, p. 805.) At the relevant time, that "underlying insurance" was the primary USF&G policy with a single limit coverage of $300,000 per

occurrence. It contained *no* "family member" exclusion. The CNA policy further required Pisciotta to maintain the underlying policy in full effect "without alteration of terms or conditions" during the life of the CNA excess coverage policy. In the event Pisciotta replaced the USF&G policy with another, the CNA policy required that such replacement coverage not be "more restrictive" than the USF&G policy. (*Ibid.*)

Further, if Pisciotta *failed* to maintain such "not more restrictive" underlying insurance, CNA's obligation was not to increase thereby. Its policy provided that "in the event of such failure, the company [CNA] shall only be liable to the same extent had the Named Insured [Pisciotta] complied with" the clause requiring maintenance of the "not more restrictive" underlying insurance. That liability undertaken by CNA was express, specific and limited. Insofar as relevant here, the assumed liability was that CNA "shall only be liable for the ultimate net loss in excess of . . . the amount recoverable under the underlying insurance *as set out in the Schedule of Underlying Insurance . . .*" up to $1 million. (Italics added.) That schedule specifically described the USF&G policy with its $300,000 limits.

It seems to me crystal clear that the intention of the parties, as reflected in the policy language, contemplated that Pisciotta was to maintain underlying insurance coverage which did *not* contain a "family member" exclusion and which *did* have $300,000 primary coverage as a condition of CNA's promise to pay any amounts for which Pisciotta was liable in excess of $300,000. The parties to the CNA policy also expressly provided that the excess carrier's undertaking was to be no greater if Pisciotta failed to maintain such underlying insurance or replacement insurance of equal coverage. Undoubtedly, the amount of premium paid by Pisciotta for CNA's excess coverage policy reflected both CNA's limited obligation and the insured's obligations in the maintenance of primary coverage.

In the face of this unambiguous expression of the commitment of each of the parties, it seems to me fanciful to suggest that either insured Pisciotta or excess carrier CNA reasonably could have assumed "at the time of contracting" (Civ. Code, § 1636) that *either* Pisciotta's failure to maintain equally comprehensive underlying insurance *or* the unpredictable insolvency of a replacement primary carrier would *increase* CNA's obligations under its umbrella policy. The majority freely acknowledges as much with respect to Pisciotta's failure to replace the

underlying policy with other equally broad primary coverage (*ante*, p. 812). However, it refuses to apply similar—and equally appropriate —reasoning to the financial failure of Reserve.

To fasten on an *excess* carrier liability for coverage within the *primary* limits, the majority in my view distorts the clear language of CNA's policy. The amount which CNA obligated itself to pay under its policy was directly related to the amounts "*set forth in the Schedule of Underlying Insurance*"—namely, *sums in excess of $300,000.* The majority transforms this promise into an obligation to pay the loss covered by the primary coverage as well. Thus, the insolvency of Reserve over which CNA has neither control, nor perhaps knowledge, unilaterally and substantially expands CNA's contractual obligations.

I believe that such a policy construction is forced and artificial and that its result does not fit the reasonable expectations of the parties. The majority imposes upon CNA a liability which it has never assumed. (See *Farmers Ins. Exch., supra*, 42 Cal.App.3d, at p. 809.)

In my view, Pisciotta's liability to Tyler is excluded from coverage under the "family member" exclusion of the Reserve policy, and regardless of Reserve's insolvency, CNA's contractual liability remains that of an *excess* carrier. It commences when Pisciotta's liability to Tyler exceeds $300,000, and I would so hold.

The petition of appellant Busch for a rehearing was denied March 19, 1982. Richardson, J., was of the opinion that the petition should be granted.