[No. A039980. First Dist., Div. Two. Nov. 13, 1989.]

UNITED STATES ELEVATOR CORPORATION, Plaintiff and Respondent, v.
ASSOCIATED INTERNATIONAL INSURANCE COMPANY, Defendant and Appellant.

638

**COUNSEL**

Stephen L. Newton, Deborah F. Schweizer and Newton, Kastner & Remmel for Defendant and Appellant.

David J. Garthe and Boornazian, Jensen & Garthe for Plaintiff and Respondent.

**OPINION**

**PETERSON, J.**—Associated International Insurance Company (Associated) appeals from a judgment in favor of United States Elevator Corporation (USEC) on USEC's complaint for damages and declaratory relief. Associated claims the trial court erred when it held that it was responsible to pay certain claims against USEC under a contract of excess insurance.  In reversing, we will hold that ambiguities existing in a

primary insurance contract must be construed so as to compel the broadest grant or expansion of insurance coverage thereunder; and that this rule of construction is not vitiated because its application may incidentally curtail or eliminate the coverage of a separate excess insurance contract issued by a separate insurance carrier, which had no responsibility for the ambiguity in the primary insurance contract.

## I. FACTUAL AND PROCEDURAL BACKGROUND

USEC manufactures, installs, services and maintains elevators. It is a subsidiary of Cubic Corporation (Cubic). Cubic purchased two policies of primary liability insurance extending coverage to USEC from Insurance Company of North America (INA). Coverage thereunder was effective as to the first policy from March 1, 1979, to March 1, 1980; and as to the second policy from March 1, 1980, to March 1, 1981. The material portions of these policies are identical.

For the same two years of insurance coverage provided under the INA policies, USEC was also insured by two successive excess liability insurance policies of Associated. In all material respects, these policies are also identical.

We will hereinafter sometimes refer to USEC as the "insured" under all of these primary and excess policies.

### A. *The INA Policies*

The INA policies provided USEC with the following coverage: 1. Single Occurrence—Liability limits of $500,000 were provided for each single occurrence; i.e., for each accident occurring during the policy period resulting in a single loss or multiple losses, coverage was limited to $500,000.

2. Aggregate Limit—As here pertinent, the policies defined certain types of losses as a "products hazard" and "completed operations hazard." Such losses were subject to the *aggregate limit* of the policies which was a limit of $500,000 annual (policy year) liability. This aggregate limit applied to all such "products hazard" and "completed operations hazard" losses; i.e., INA's annual indemnity liability therefor was limited to $500,000, regardless of the number of such defined losses occurring as a result of an accident or accidents during the policy year.

3. Deductible Features—These policies were purchased with a deductible provision of $500,000, by which USEC, as the INA insured, was responsible

for payment of the first $500,000 of all losses resulting from each accident occurring during the policy periods; and by which USEC was further responsible for payment of the first $500,000 of those losses subject to the annual aggregate limit.

4. Effect of Deductible Features—The parties concede that the first effect of this $500,000 deductible provision of the policies was simply to leave USEC, as insured thereunder, with no indemnity coverage from INA as to any single occurrence, because the deductible $500,000 equaled the $500,000 liability limit INA had accepted under the policies; and that the further effect of this $500,000 deductible provision was to leave USEC with no indemnity coverage from INA as to the defined losses covered by the annual $500,000 *aggregate limit,* because the annual deductible of $500,000 equaled the $500,000 annual aggregate limit INA had accepted under the policies.

Thus, USEC only received for the primary insurance premium it paid INA the professional investigative and claims services of the latter as to all such occurrence claims, and all such claims subject to the aggregate limit, for injuries and damages arising under the INA policies. The premiums paid by USEC to INA were substantially less than USEC would have paid for the INA policies without the deductible feature above summarized.

## B. *The Associated Policies*

The Associated policies were issued to extend indemnity to USEC in excess of the liability insurance coverage provided by the INA policies. Associated was aware of the deductible features of the INA policies when it issued its excess policies. The Associated policies extended coverage to USEC for any losses or damages arising out of *a single occurrence* during the policy period which exceeded $500,000, the limit of liability therefor under the INA policies; and extended coverage to USEC for all losses during the policy year defined under the aggregate limit of the INA policies in excess of $500,000.

## C. *Coverage Analysis*

The *broadest and most expanded coverage* of the INA policies was literally that relating to losses arising from a single occurrence. The policies required indemnity therefor of $500,000 as to each single or multiple loss arising from any single occurrence during the policy year, regardless of the number of such single occurrences during that year.

The *narrowest and least expanded coverage* of the INA policies was literally that relating to defined losses ("products hazard" and "completed operations hazard" losses) subject to the aggregate limit of $500,000. Once such a loss or combination of losses had been indemnified by INA in a policy year, by payment of a total of $500,000, INA was relieved from any further coverage responsibility for such losses.

Since USEC, however, chose the deductible features of the INA policies above summarized, the practical effect of the choice was that USEC thereby elected to become self-insured as to *all* losses resulting from every single occurrence in a policy year, i.e., it stood in the place of INA in providing self-indemnity for *all* losses up to $500,000 for every single occurrence during the policy year; and obtained no single occurrence indemnity coverage from INA at all. USEC also received no indemnity coverage from INA for "products hazard" and "completed operations hazard" losses under the aggregate limit loss provisions of the INA policies for the same reasons. INA's aggregate loss liability was similarly capped at the same $500,000 amount applicable to the deductible feature of the aggregate loss coverage. Payment by USEC of the first $500,000 of the defined losses, subject to the INA policies' aggregate limit, would trigger Associated's excess liability coverage.

Associated, as the excess carrier, was responsible to indemnify USEC for its liability for loss or losses in excess of $500,000 for any *single occurrence* during the policy year. Where the aggregate loss limit of $500,000 was reached in any year, Associated was responsible to indemnify USEC for all defined losses subject to that aggregate loss limit, i.e., for all completed operations hazard losses and products hazard losses in excess of $500,000 occurring in a policy year.

D.   *The Claim*

Between March 1, 1979, and March 1, 1981, USEC became potentially liable for damages asserted in a number of cases alleging that its elevators were defective. At trial below, these claims and suits were referred to as "products cases." USEC also became potentially liable for damages in a number of claims and suits alleging that it had negligently maintained or serviced certain elevators. These claims and suits were referred to as "services cases." The parties agreed that the products cases were subject to the $500,000 aggregate limit of the INA policies. The dispute here turned on the indemnification liability of Associated as to the services cases, i.e., were services cases also subject to the aggregate limit of the INA policies as losses arising from products hazards or completed operations hazards.

The parties agreed at trial that, in the 1979-1980 policy year, the aggregate coverage of $500,000 defined by the INA policy was exhausted by the payment of settlements in products cases. For that year, USEC expended $273,230.23 in settlement of services cases. If, as USEC claimed, those services cases were also subject to the aggregate limit of the INA policy to which the Associated policy provided excess coverage, USEC was entitled to recover indemnification therefor from Associated.

For the 1980-1981 policy year, the total settlements of products or services cases individually did not total $500,000. However, USEC cumulatively paid $950,392.49 in settlement of products and services cases. Similarly, if those services cases were subject to the aggregate limit of the INA policy to which the Associated policy afforded excess coverage, USEC was entitled to recover $450,392.49 which represented the amount spent for losses in excess of the $500,000 aggregate limit.

In addition, USEC expended $214,030.79 in defending 1979-1980 services cases and 1980-1981 products and services cases. If the services cases in both periods were subject to the aggregate limit of the INA policies, USEC was entitled to recover that additional amount from Associated under the terms of the latter's excess policies.

In the fall of 1981, Norman Blumen, an attorney employed by USEC, tendered the defense of the claims at issue in the services cases to Clayton Dukette, vice-president of claims for Associated. Dukette denied Associated's coverage or liability for such claims.

In October 1982, USEC filed a complaint against Associated seeking damages for the amount of the disputed services case claims, and related defense fees and costs; and a declaration of rights as to Associated's responsibility to pay such claims in the future. In October 1986, the matter was tried before the Alameda County Superior Court. After a three-day trial, the court issued its statement of decision and judgment thereon awarding USEC damages of $937,653.51; prejudgment interest of $395,133.54; costs of suit; and a declaration that future judgments and settlements arising out of "products cases" or "services cases" during the applicable policy periods, together with costs of defense, would be the responsibility of Associated.

This timely appeal followed.

## II. DISCUSSION

The parties at trial devoted substantially all of their presentation of evidence to the court toward their respective versions of whether a claimed

ambiguity existed in the INA policies; and if so, how it should be interpreted and applied.

The claimed ambiguity or uncertainty of the INA insurance policies arose from the language of an endorsement concerning the aggregate coverage of the INA policies. In pertinent part, it reads as follows: "Regardless of the number of (a) Insureds under this policy, (b) persons or organizations who sustain bodily injury or property damage, or (c) claims made or suits brought on account of bodily injury or property damage, the Company's liability is limited as follows: [¶] . . . [¶] 2. Subject to the above provision respecting 'each occurrence[,'] the total liability of the Company for all damages because of bodily injury, including damages for care and loss of services, or property damage, or both combined, which occurs during each annual period while this policy is in force commencing from the effective date and which is described in any of the lettered subparagraphs below shall not exceed the limit of liability stated in the Schedule of this endorsement as 'aggregate': [¶] . . . [¶] (c) all bodily injury and property damage included within the completed operations hazard and all bodily injury and property damage included within the products hazard[.]" The schedule attached to endorsements to the INA policies provided that INA's yearly aggregate liability for losses falling within the "completed operations hazard" or "products hazard" was $500,000.

The definition of "completed operations hazard" is found in the INA policies of insurance as follows: " '[C]ompleted operations hazard' includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. 'Operations' include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times: [¶] (1) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed, [¶] (2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or [¶] (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project. [¶] Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed. [¶] *The completed operations hazard does not include bodily injury or property damage arising out of*

[¶] . . . [¶] *(c) operations for which the classification stated in the policy or in the Company's manual specifies 'including completed operations*[.]' " (Italics added.) (The italicized portion is hereafter referred to as subsection (c).)

The ambiguity/uncertainty issue, as the parties substantially agreed at trial, was said to arise primarily from subsection (c) above italicized. That subsection purported to exclude from the definition of "completed operations hazard" (and derivatively from the aggregate limits of the INA policies) operations classified by "the Company's manual" by a specification entitled "including completed operations."

In its brief at trial, USEC stated: "With certain businesses, the insurance industry decided that the line between completed operations and premises-operations was so close that it would give the completed operations coverage to the insured as part of his premises-operations coverage. [Fn. omitted.] The inclusion of subsection 'c' of the definition of 'completed operations hazard' accomplished that objective. In actuality, then, the clause at issue was designed to be a *grant of coverage. Not only was the insured getting an additional kind of coverage (completed operations), he was getting additional limits because his operations were no longer subject to an aggregate limit.*" (Underlined italics in the original; other italics added.)

Parol evidence to resolve this claimed ambiguity was presented by both parties. Associated presented testimony from several witnesses, including the underwriter who issued its policies of excess insurance; Associated's president; and an expert witness, who testified that the effect of subsection (c), quoted above, was to exclude USEC's elevator and service operations from the definition of a "completed operations hazard." The mechanism by which this was urged was complex. While subsection (c) purported to exclude from the definition of "completed operations hazard" those "operations for which the classification stated in the policy or in the Company's manual specifies 'including completed operations,' " it was clear at trial that the term "including completed operations" was not defined in the policies issued by INA. Thus, Associated urged it was necessary to interpret the "Company's manual" to determine whether USEC's service and maintenance operations were classified as "including completed operations."

Further trial testimony established, however, that the "Company's manual" is in fact not a manual issued by INA, but the manual prepared by the Insurance Service Office (ISO), a statistical gathering organization which prepares insurance rates and forms. Associated (in an argument seemingly consistent with the quotation from the trial brief of USEC, *ante*) urged that, under the applicable portion of the ISO manual, USEC's elevator service

and repair operations should be deemed included in the "premises-operations" coverage of the INA policies for which no aggregate limit applied.

In the final analysis, however, despite its trial brief discussion, *ante,* USEC argued that the INA policies did not clearly and unambiguously advise the insured that its elevator service and maintenance operations did *not* come within the policies' "completed operations hazard"; and therefore, that, under USEC's version of the rules of interpretation applicable to insurance contracts, the resulting ambiguities and uncertainties of the INA insurance contract had to be finally construed so as to place such completed operations hazard, and the services cases arising therefrom, under the *aggregate coverage* of the INA policies. The apparent rationale of this USEC position was that such interpretation would trigger the excess coverage of Associated's policies as to such cases; and in the overall scheme of the insurance coverage with the deductible features USEC had selected, would thereby provide the maximum insurance indemnity to USEC under the applicable policies.

The trial court adopted this USEC position in holding that the INA policies were contracts of adhesion; and that subsection (c) was ambiguous because nothing in the policies or the "Company's manual" clearly advised USEC that its losses, arising out of its service and maintenance operations, did not fall within the completed operations hazard. Accordingly, the court construed all ambiguities against Associated and in favor of USEC.

On appeal Associated challenges the trial court's holding on several grounds. Primarily, Associated claims that the trial court erred when it construed the ambiguities in the INA contract and subsection (c) to trigger the excess coverage of the Associated policies. We agree.

Any ambiguity or uncertainty in an insurance policy is resolved against the insurer and in favor of the insured. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) This rule of construction is ordinarily a benefit to the insured. Thus, for example, assuming only the primary insurance of INA were applicable, had USEC purchased insurance policies with no deductible or a deductible of less than $500,000 (the amount of INA's contractual indemnity liability), the ambiguities of the INA policies would have been construed against INA and in favor of a broader grant of coverage by the INA contract to USEC. Under this scenario, a finding that subsection (c) was indecipherably ambiguous would have required the policies to be interpreted in the way most favorable to the insured; i.e., by interpreting the services claims in question

to be the subject of the policies' *occurrence* rather than its *aggregate* coverage provisions, since that result would have favored the insured by providing it indemnity against an unlimited number of single occurrences during the policy year generating loss or losses, subject only to the limit of $500,000 for losses caused by each such occurrence.

However, in this case, the insurance arrangement between USEC and INA was unusual. USEC purchased insurance policies with a $500,000 coverage limit subject to a $500,000 deductible. Thus, the normal construction against INA of the ambiguity in its policies, so as to provide USEC the expanded occurrence coverage for the services claims, would act to the detriment and not the benefit of USEC. This result occurs only because USEC chose to contract with INA for a $500,000 deductible under the policies that literally required USEC as the self-insured it had contracted to be, *not* INA, to pay all resulting losses from *each* occurrence up to the $500,000 limit of INA's policy liability. INA was thereby absolved from liability to indemnify USEC for *any* occurrence claim during the policy period.

The paradox is simply that USEC can only recover here from Associated if, contrary to the general rules of interpretation, the INA policy ambiguity is interpreted or applied to require indemnity to USEC for losses from services claims with the least and most restrictive indemnity coverage those policies offer, i.e., aggregate coverage with an annual cap of $500,000.

The ordinary rules of construction of ambiguity or uncertainty in a contract of primary insurance, as between insurer and insured as expounded in *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d 800, resolve that ambiguity or uncertainty, relating to the extent of the indemnity coverage the contract provides, against the insurer who proposed and prepared the contract in favor of expanding or granting (rather than reducing or eliminating) the insurance coverage for the insured's benefit. (*State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 101-102 [109 Cal.Rptr. 811, 514 P.2d 123].)

■ We are cited to no authority which would vary these uniform and long-standing rules of construction in this state because the insured elected to opt for any, or an unusual, deductible provision of the insurance contract with its primary carrier; thereby requiring a contrary construction and application of the ambiguity in the primary policy terms in order to generate greater coverage for the insured under the terms of a separate excess insurance policy issued by a third party carrier. We see no sound argument of principle for variation of this basic rule of construction for such reasons.

The general rules of construction, thus applied to the ambiguity or uncertainty of the INA policies and subsection (c), require the services claims in question to be indemnified under the occurrence coverage of the INA policies, rather than its more limited aggregate coverage, because such interpretation grants the broader benefit to the insured under the INA policies, *which are the policies containing the indecipherable ambiguity that required the court's coverage determination.*

An alternative and equally compelling analysis supports this result. We have observed that generally any ambiguity or uncertainty in an insurance contract is to be resolved against the insurer issuing that policy and in favor of the insured. (*Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 807.) This rule is not applicable to Associated in the present case. ■ "[T]he principle that ambiguities in insurance policies must be strictly construed against the insurer stems, primarily, from a recognition of the typical relationship between the parties. Ordinarily, [the court is] faced with a conflict between the purchaser of an insurance contract and the insurance carrier. In such cases, it is typically the carrier who drafts the insurance contract, unilaterally, and for policy reasons is thus held responsible for any ambiguity in language." (*Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 [204 Cal.Rptr. 435, 682 P.2d 1100].)

In *Fireman's Fund Ins. Co.* v. *Fibreboard Corp.* (1986) 182 Cal.App.3d 462, 467-468 [227 Cal.Rptr. 203], the appellate court affirmed a trial court's order granting summary judgment, holding that the general rules of strict construction against an insurer and in favor of an insured were inapplicable where the insured proposed or drafted the language of the insurance contract at issue. Similarly, in *University of Judaism* v. *Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937, 941 [132 Cal.Rptr. 907], the court refused to apply the rule that ambiguities are construed against the insurer as drafter where the language at issue was contained in a standard form insurance policy required by the Insurance Code. (See also *Ohran* v. *National Automobile Ins. Co.* (1947) 82 Cal.App.2d 636, 648 [187 P.2d 66]; *Ichthys, Inc.* v. *Guarantee Ins. Co.* (1967) 249 Cal.App.2d 555, 558 [57 Cal.Rptr. 734].)

■ Here, the language of subsection (c) is contained in the INA contract of insurance. It was neither drafted nor approved by Associated. Since Associated was not responsible for the language of the INA contract, the trial court erred when it construed the ambiguities of the INA primary policies against Associated.

In support of the judgment, USEC raises two alternate arguments. ■ First, it claims that subsection (c) was not designed to be applied in the

factual circumstances of this case. USEC points to testimony of Roger Bohning, the underwriter who was responsible for the Associated policies of insurance, who testified that the application of subsection (c) to this case was "debatable" because it was merely a premium setting device used by primary insurers. In this case, INA did not set the policy rates based upon the ISO manual. Thus, citing well established rules requiring this court to consider the evidence in the light most favorable to the prevailing party, USEC argues that it was inferentially established at trial that subsection (c) is inapplicable, and did not govern the determination of whether the services cases were covered by the per occurrence or aggregate limits of the INA policies.

Initially, we observe that this inference USEC now urges on us is directly contrary to its opening trial brief contention that subsection (c) of the INA policies was applicable to grant "completed operations" coverage to USEC under the "additional limits" of occurrence coverage. Moreover, on appeal we cannot indulge in a presumption which contradicts an express recital in the record. Where the record states what was done, it will not be presumed that something else was done. (*Steuri* v. *Junkin* (1938) 27 Cal.App.2d 758, 760 [82 P.2d 34]; see also 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, p. 277.) Here, the trial court expressly found subsection (c) *indecipherable*; it did *not* find subsection (c) applicable or inapplicable to the coverage question after first interpreting its meaning. No contention is made by USEC that the court's finding of indecipherability was not supported by substantial evidence in the record. The inference upon which USEC relies is inapplicable.

■ Next, USEC argues that, even if subsection (c) operated as contended by Associated, it is in conflict with another portion of the policies. It points to the testimony of John Dewey, Associated's expert witness, who testified that the "additional declarations" portions of the INA policies were poorly done; and that an insured reading those portions would believe its services claims, as completed operations activities, would fall within the aggregate limit of the INA policies. USEC contends that Dewey's testimony is supported by an ambiguity present in the "additional declarations" attached to an endorsement to the INA policies. The ambiguity is alleged to be found by comparison of certain of the printed words of subsection (c) with certain of the typewritten entries on the "additional declarations." USEC cites the rule that, when there is a conflict between a typewritten portion of the policy and a preprinted portion, the typewritten portion controls. (See generally Civ. Code, § 1651.) USEC urges from the foregoing that we must uphold the trial court, whose findings allegedly conform with Dewey's testimony and the reasonable inferences to be drawn therefrom.

The trial court did not expressly find that the INA policies granted USEC coverage for its service and maintenance operations under the aggregate limits on the basis of Dewey's testimony or any other evidence. Had it done so, substantially supported by the record, under the rules of appellate review, we would be obligated to accept that finding. Instead, as a first alternate basis for its decision, the court found a second ambiguity in the INA insurance policies because of a claimed conflict between the "additional declarations" and the language of subsection (c). The court again found that second ambiguity in the INA insurance policies required an interpretation of the INA policies of aggregate coverage of services claims, so as to trigger Associated's policy coverage of the USEC services claims. As a corollary alternative basis for its decision, the court found that the second ambiguity in the INA insurance contract, arising from alleged conflicting language in the printed language of subsection (c) and the typewritten language of the "additional declarations," required the typewritten portion to prevail; and that the application of this rule also required the same interpretation of the INA policies.

As we have discussed above, the rules of insurance contract interpretation cannot be erroneously used, as they were here, to construe such ambiguity so as to effectively minimize the primary coverage simply in order to trigger the application of a separate excess policy. Further, there is no evidence in the record to support the trial court's conclusion, contained in a statement of decision prepared by the prevailing party, that the typewritten "additional declarations" sections of the INA policies conflict with the preprinted portions. There is no conflict, per se, between subsection (c) and the "additional declarations" portions of the INA policies. The language of the "additional declarations" literally only contains the typed word *"included"* (italics added), under a heading entitled "completed operations," and says nothing about whether USEC's service and maintenance activities are covered by an aggregate or a per occurrence limit. Dewey's testimony, as to what a reasonable man would conclude concerning the INA policies' aggregate or per occurrence coverage limits applicable to the services claims upon reading the "additional declarations" portions of the INA policies, at most simply raised a question of interpretation of the ambiguous language of an insurance contract. Such question was required to be resolved in favor of providing the most expansive and least restrictive coverage of the policies containing the ambiguity.

## III.   DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with directions to vacate its judgment in this case and to enter judgment for Associated.

Smith, Acting P. J., and Benson, J., concurred.

A petition for a rehearing was denied December 11, 1989, and respondent's petition for review by the Supreme Court was denied February 1, 1990.