**ASSOCIATED INDEMNITY CORPORATION,**
Plaintiff,

v.

**FAIRCHILD INDUSTRIES, INC., First State Insurance Company, Allstate Insurance Company (as successor to Northbrook Excess and Surplus Insurance Company), and Highlands Insurance Company, Defendants.**

**No. 90 Civ. 4238 (MBM).**

United States District Court,
S.D. New York.

Aug. 23, 1991.

Marian S. Hertz, Sheft & Sheft, New York City, for defendant Highlands Ins. Co.

Richard C. Browne, Winston & Strawn, Washington, D.C., for defendant Fairchild Industries, Inc.

OPINION AND ORDER

MUKASEY, District Judge.

Defendant Highlands Insurance Co. ("Highlands") moves for sanctions against defendant Fairchild Industries, Inc. ("Fairchild") for its refusal to dismiss Highlands from this suit. Highlands' motion for sanctions is granted for the reasons and to the limited extent set forth below.

I.

The background to this motion is as follows: In or about late 1980 or early 1981, Diggs Sanitation, Inc. ("Diggs"), then a licensed hazardous waste hauler, contracted with Fairchild to haul hazardous waste generated at Fairchild's Washington County, Maryland facility to a licensed facility in Clairton, Pennsylvania. Instead of bringing Fairchild's waste to that facility, Diggs disposed of it on its own Allegheny County, Maryland property and on nearby property belonging to Cumberland Cement Co. ("Cumberland"). These disposal areas are referred to collectively by the Environmental Protection Agency ("EPA") as the Limestone Road site. In 1981, the Maryland Office of Environmental Programs ("OEP") suspended Diggs' license to haul hazardous waste, and directed Diggs and Cumberland to clean-up their respective properties.

In March 1982, EPA Region III conducted a preliminary assessment of conditions at the site, and on April 12 and 25, 1983, first contacted Fairchild about the site by sending a request for information. Fairchild responded in May 1983. In July 1986, EPA Region III completed a Remedial Investigation/Feasibility Study at the site. On August 11, 1986, EPA Region III advised Fairchild that it was a potentially responsible party, and therefore liable for clean-up of the contaminated Limestone Road site. In 1984 Cumberland filed a civil suit in Maryland state court against Fairchild and Diggs seeking $7 million in damages.

In 1988 the EPA filed an action under 42 U.S.C. § 9604 ("CERCLA") against Fair-

child and Cumberland in Maryland federal court. The State of Maryland later joined the EPA as a plaintiff. In conjunction with that action, the parties entered into a partial consent decree, filed on December 19, 1989, in which Cumberland and Fairchild agreed to share certain costs relating to clean-up of the site.

In or about December 1989, Fairchild commenced an action for declaratory relief in the Northern District of California against five insurance carriers which had issued policies to Fairchild for the January 1, 1981 to January 1, 1982 policy period, seeking a declaration that those carriers were obligated to indemnify Fairchild for defense and remediation costs incurred in connection with the EPA's 1988 CERCLA action, as well as Cumberland's action for contribution. The five insurance carriers are: Associated Indemnity Corp., Fireman's Fund, First State, Allstate and Highlands.

Allstate and Highlands are both "excess" carriers—that is, carriers whose coverage is not triggered until the underlying costs exceed a certain amount. The Highlands policy at issue, SR 21196, effective January 1, 1981 to January 1, 1982, "has limits of $3 million part of $5 million excess of $25 million." (Hertz Affidavit, dated 2/28/91, p. 2) In other words, Allstate pays two-fifths of all liability in excess of $25 million; Highlands pays the other three-fifths. Allstate also issued an excess policy which applies when liability exceeds $15 million. As Fairchild describes it, Highlands and Allstate together provide the fourth layer of excess insurance coverage (in excess of $25 million). Allstate provides the third layer (between $15 million and $25 million). Transit Casualty Insurance Co., which is currently in liquidation proceedings and hence has not been joined as a party, provides the second layer of excess coverage, and First State provides the first layer.

Associated Indemnity is the primary insurer.

Highlands and Allstate successfully moved to dismiss in the California action for failure to join an indispensable party.[1] The remaining suit was transferred to this court, where Associated Indemnity had previously filed suit, seeking a declaration of rights and obligations among Fairchild (the policy holder), Associated (the primary insurance carrier), and the excess insurance carriers with respect to the legal actions brought by the United States, the State of Maryland and Cumberland in connection with the Limestone Road site clean-up.

Highlands moved to dismiss, and for sanctions against Fairchild for refusing to agree to dismiss Highlands from the suit without prejudice. Before a decision by this court on the motion to dismiss, the parties settled. Only Highlands' motion for sanctions against Fairchild remains outstanding.

## II.

Highlands argues that because there was no case or controversy involving Highlands, Fairchild is liable for Highlands' costs in this action because it refused to agree to dismiss Highlands from the lawsuit without prejudice. The crux of Highlands' argument is that the underlying cost to Fairchild of cleaning up the Limestone Road site will under no set of facts total more than $25 million. Therefore, Fairchild could not have believed reasonably that Highlands' coverage would be triggered, and it should be sanctioned for forcing Highlands to remain in the litigation.

In support of its argument, Highlands cites the various estimates of the cost of cleaning up the Limestone Road site articulated by the government as well as by Fairchild. All of those estimates run well below $25 million. In addition, argues Highlands, as of now, under the partial

---

1. Fairchild had voluntarily dismissed First State, the first level excess insurance carrier, in order to preserve complete diversity. Highlands and Allstate argued that because, under the terms of its policy, Highlands' coverage was not implicated until coverage under the First State policy was exhausted, First State is a nec-essary and indispensable party. The Highlands policy is a "following form" policy, which means that it provides coverage in accordance with the terms and provisions of an underlying policy to which it follows form, in this case, First State.

consent decree agreed to in the Maryland action, Cumberland and Fairchild share the costs of the clean-up, thereby reducing Fairchild's ultimate liability.

Fairchild offered to consent to the voluntary dismissal without prejudice of all of the excess carriers, but when Associated Indemnity would not consent to the dismissal of First State, Fairchild refused to consent to the dismissal of the rest, including Highlands. Fairchild explains that it feared that if Associated Indemnity dropped claims against the excess insurers, Fairchild could not then maintain a cross-claim or third-party claim against the excess insurers in the same suit, because Fairchild and First State were non-diverse and a cross-claim against First State would not meet the test of diversity jurisdiction. Fairchild wanted all of the excess insurers joined in a single suit in order to avoid inconsistent judgments. Fairchild therefore sought either for Associated Indemnity to maintain its claim against all the insurers, or for Fairchild to be able to sue all three together in a separate lawsuit. However, even ignoring the availability of ancillary jurisdiction, this explanation does not help Fairchild if there was no possibility that liability would reach Highlands' policy.[2]

■ Declaratory judgments are available only to resolve an actual controversy. *Prudent Pub. Co. v. Myron Manufacturing Corp.*, 722 F.Supp. 17 (S.D.N.Y.1989). "No case or controversy exists upon which to grant claims for ... declaratory relief if there is no real and immediate, as opposed to hypothetical or conjectural, threat of injury." *Washington Square Post 1212 American Legion v. New York*, 720 F.Supp. 337, 354 (S.D.N.Y.1989), *rev'd in part*, 907 F.2d 1288 (1990). The fact that

liability is contingent does not *per se* defeat jurisdiction under the Declaratory Judgment Act. *National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 670 F.Supp. 424 (D.D.C.1987). But "[i]n determining whether a dispute hinged on a contingency is justiciable, courts should focus on 'the practical likelihood that the contingencies will occur and that the controversy is a real one.'" *Id.*, (quoting *Browning-Ferris Indus. of Alabama, Inc. v. Alabama Dep't of Environmental Management*, 799 F.2d 1473, 1478 (11th Cir.1986)); *Lumbermens. Mutual Casualty Co. v. Borden Co.*, 241 F.Supp. 683 (S.D.N.Y.1965); *American Machine & Metals, Inc. v. De Bothezat Impeller Co.*, 166 F.2d 535 (2d Cir.1948).

Fairchild argues that the 1986 cost estimates Highlands cites in support of its argument that the underlying costs do not approach $25 million do not take into account the 1986 amendments to CERCLA. Those amendments include provisions relating to degree of clean-up and requiring periodic review of remedial measures when hazardous substances remain at a site. Because one of the 1986 cost estimates was in excess of $15 million, even without taking into account these amendments, Associated's request for declaratory relief was not premature as to Highlands.[3]

Also, the fact that the estimated cost for implementation of the interim remedial measures and to conduct the second remedial investigation and feasibility study required by the partial consent decree was, as of March 13, 1990, $1.7 to $2.25 million, is not significant because this figure does not include Fairchild's liability for the United States' and Maryland's costs in overseeing the partial consent decree, nor does the partial consent decree resolve Fairchild's potential liability for the government's past

2. Fairchild also offered to consent to the dismissal of Highlands if Highlands agreed to be bound by the decision in this declaratory judgment action. Highlands refused.

3. According to the description included in Exhibit K to the February 28, 1991 Hertz Affidavit, the $15 million estimate includes regular future monitoring of ground water, surface water and sediment on the site. Total capital costs were estimated at $14,332,300, including soil excava-

tion at a cost of $13,279,000, and surface water and sediment monitoring on a yearly basis at a cost of $67,800. Operation and maintenance costs were estimated at $1,053,000 based on a 30-year period. The total estimated costs were therefore $15,385,300. These estimates were expected to be accurate within + 50% to − 30%. None of the other alternatives had estimated costs in excess of $3 million.

response costs plus interest, for certain claims relating to possible additional response actions, or for claims for damages to natural resources. The United States claims that, as of May 1989, it incurred response costs of over $1.4 million.

In addition, Fairchild argues, the remedial measures outlined in the partial consent decree are characterized as only interim remedies. Additional remedial actions may be required by the United States. The partial consent decree does not allocate liability between Fairchild and Cumberland. Under a joint and several liability theory, Fairchild could be held liable for all costs, and therefore any Cumberland contribution should be discounted. Finally, Cumberland filed a civil suit in Maryland state court arising out of the dumping against Fairchild and Diggs in 1984 asking for $7 million.[4] "Therefore, while Highlands' policy may not be implicated based upon current expenditures, or projected estimates for current interim remedial measures, the real possibility exists that its policy will be implicated by presently unknown and unascertainable costs." (Fairchild Memorandum of Law in Opposition to the Renewed Motion for Sanctions, p. 18)

Finally, Fairchild argues that the Highlands and Allstate policies may be triggered even if costs do not exceed $25 million, because excess insurance coverage may "drop down" to provide coverage in the event that underlying coverage becomes uncollectible. In this case, because Transit is in liquidation proceedings, Highlands may be forced to provide coverage for claims in excess of $15 million. Because one remedial measure proposed by the EPA is estimated to cost more than $15 million, Highlands' coverage may be triggered. In support of its "drop down" theory, Fairchild cites a Fifth Circuit case interpreting the provisions of an umbrella insurance policy under Louisiana's insurance law, which case in turn cites California and Illinois cases also recognizing Fairchild's "drop down" theory. *Sifers v. General Marine Catering Co.*, 892 F.2d 386 (5th Cir.1990).

■ Those cases turn on the hornbook rule that an ambiguity in an insurance contract must be resolved against the insurer. In those cases, the excess insurer issued policies stating that its coverage was triggered only for amounts in excess of the amount recoverable from underlying insurance. The term "recoverable" can be interpreted to mean either the amount that theoretically could be recovered or the amount that is actually recoverable. Therefore, where the underlying insurer is insolvent, the term is construed by the court to mean the amount actually recoverable. The coverage of the excess insurer then "drops down" to fill the void in coverage created by the insolvency. *See Donald B. MacNeal, Inc. v. Interstate Fire and Casualty Co.*, 132 Ill.App.3d 564, 477 N.E.2d 1322, 87 Ill.Dec. 794 (3rd Div.1985); *Reserve Insurance Co. v. Pisciotta*, 30 Cal.3d 800, 180 Cal.Rptr. 628, 631–33, 640 P.2d 764, 767–69 (1982). Highlands' policy is not similarly ambiguous. The policy states:

> In consideration of the stipulation herein named and of the premium specified below [Highlands] does insure [Fairchild] ... to an amount not exceeding the amount(s) as may be hereafter provided, against liability or property risks herein described.
> AMOUNT $ 3,000,000.   PART OF
> $ 5,000,000.   EXCESS OF
> $25,000,000.

(Hertz Affidavit, dated 2/28/91, Exh. A) Because there is no ambiguity in the policy, and New York does not appear to recognize "drop down" coverage, *Prince Carpentry, Inc. v. Cosmopolitan Mut. Ins. Co.*, 124 Misc.2d 919, 479 N.Y.S.2d 284, 292–93 (Sup.Ct.N.Y.Co.1984), Fairchild cannot reasonably argue that "drop down" coverage is warranted by existing insur-

---

**4.** Highlands argues that CC & SC seeks only $2 million in compensatory damages. The remainder is punitive, and therefore presumably would not be covered under the policy. *But see Alcolac, Inc. v. St. Paul Fire & Marine Ins. Co.*, 716 F.Supp. 1541, 1545 (D.Md.1989) (under Maryland law, insurance policies cover punitive damage awards if losses in general are covered). For purposes of this motion, I will assume that to the extent that the damages Cumberland seeks are punitive, they are covered under Highlands' policy.

ance law in New York or Maryland, or that it has a good faith argument for so extending the law.

■ In summary, as of the time that Fairchild opposed Highlands' request for a voluntary dismissal without prejudice, there was no probability that Highlands' insurance policy would be triggered. Fairchild anticipated liability of $1.7 to $2.25 million for the interim remedial measures, $1.4 million in past response costs up until 1989, plus possible additional response costs past that date, plus interest, and potential civil liability to Cumberland, the amount of which will depends in part on the extent to which Cumberland contributes to the cost of clean-up. Fairchild reasonably could have anticipated future demands by the EPA, but not costs in excess of the $15 million required by the most comprehensive remedial alternative considered by the EPA. Without taking into account possibilities that were at the time the papers were filed mere conjecture, these costs do not amount to a total anywhere near $25 million. There is no genuine legal dispute if there are no specific allegations that make it more than a contingent speculation which may never occur that Highlands' policy limitations will be reached. *See Combustion Engineering, Inc. v. Travelers Indemnity Co.*, 75 A.D.2d 777, 428 N.Y.S.2d 235 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 875, 423 N.E.2d 40, 440 N.Y.S.2d 617 (1981). For these reasons, Fairchild had no reasonable legal basis for arguing that Highlands should remain in this lawsuit.

### III.

■ Rule 11 provides for sanctions " 'when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in' a pleading, motion, or other paper signed by a party or his counsel ... it was not intended to provide a mechanism for imposing sanctions for any and all improper conduct of a party or its counsel during the litigation." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1268 (2d Cir.1987) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986), *cert.*

*denied sub nom, County of Suffolk v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987)). Nor, in this circuit, does Rule 11 impose a continuing obligation on a party who files a paper to withdraw meritless claims. *Oliveri*, 803 F.2d at 1274–75.

Highlands seeks attorneys' fees and costs for all of its efforts in this litigation, but the first signed paper submitted by Fairchild was its memorandum of law in opposition to Highlands' motion to dismiss and for sanctions filed on March 9, 1991. Sanctions can be awarded under Rule 11 only if that memorandum was frivolous, and then only to the extent that Highlands was forced to respond to that memorandum.

Although a court may award sanctions against attorneys under Rule 11 for actions taken prior to a filing—if an attorney does not make reasonable inquiry into applicable law and facts prior to the time a paper is filed with the court—it does not follow that Fairchild may be sanctioned for refusing to dismiss Highlands prior to March 1991. To say that an attorney must make reasonable inquiry before filing a paper does not mean that every act that occurs before the filing of a frivolous paper is automatically sanctionable under Rule 11.

■ A court may award sanctions under its inherent power, or under 28 U.S.C. § 1927, for conduct not associated with filings, but only when there is " 'clear evidence' that the challenged actions 'are entirely without color and are taken for reasons of harassment or delay.' " *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (citations omitted). To justify sanctions, therefore, I need find that Fairchild had both a colorless claim and an improper purpose in asserting it. *Id.* Although I find that Fairchild did not have a reasonable basis in law for refusing to consent to Highlands' dismissal, I do not find clear evidence that it did so "for reasons of harassment or delay."

■ Accordingly, Highlands is entitled only to Rule 11 sanctions, and will be

awarded the costs associated with its reply to Fairchild's memorandum in opposition to the motion to dismiss, with its renewed motion for sanctions to the extent that motion has been granted but not otherwise, and with any discovery which took place after its motion to dismiss was served on Fairchild. The parties are directed to confer in an attempt to agree upon the amount and form of a judgment. Absent such agreement, Highlands is directed to submit to the court on or before September 20, 1991 a proposed judgment, accompanied by proof of costs and fees backed by contemporaneous time records in accordance with *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147 (2d Cir.1983), as well as records of any disbursements. Plaintiff may file objections and any counter proposed judgment on or before October 1, 1991.

SO ORDERED.