Filed 8/2/22  In re K.F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | |
| | D079899 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4624A) |
| v. | |
| C.F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant.

Lelah S. Fisher, under appointment by the Court of Appeal, for Minor, K.F.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

1

C.F. (Father) appeals a dispositional order in the Welfare and Institutions Code[1] section 300 dependency proceedings for his minor daughter, K.F., placing her with a maternal relative rather than Father after removing her from the physical custody of her mother, M.B. (Mother), and her stepfather, S.P. Father contends that substantial evidence does not support the juvenile court's finding, by clear and convincing evidence, that it would be detrimental to K.F. to be placed with Father within the meaning of section 361.2. Because we conclude there is substantial evidence to support the court's finding, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *K.F.'s Family*

Mother was born in the Philippines and, as a teenager, began a relationship with Father while living there. In 2013, she moved to San Diego when she was seven months pregnant.[2] When Mother gave birth to K.F., she named Father as the father on the birth certificate.

A few years later, Mother began a new relationship with S.P., who treated K.F. as his own child. That relationship led to the birth of Mother's other daughters, Aa.P., in 2018, and Au.P., in 2021.[3]

---

[1]    All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    Father continued to reside in the Philippines.

[3]    Mother named S.P. as Aa.P.'s and Au.P.'s father on their birth certificates.

2. *Dependency Petition*

In April 2021, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) dependency petition for K.F., alleging she had suffered, or there was a substantial risk she would suffer, serious physical harm or illness as a result of the failure or inability of her parents to supervise or protect her adequately because of substance abuse. In particular, the petition claimed that Mother abused methamphetamine and tested positive for amphetamine and methamphetamine while she was pregnant with Au.P. It further asserted that Mother denied any narcotic use.

In its detention report, the Agency stated that K.F. had attended only three of 83 days of virtual school and fed herself and her sibling, Au.P., while Mother slept. At the time of the detention hearing, K.F. and her two siblings were residing with, and being cared for by, their maternal great-aunt and great-uncle. The court found that the Agency had made a prima facie showing on its petition and that S.P. was the presumed father pursuant to Family Code section 7611, subdivision (d). It detained K.F. out of the home and gave the Agency discretion to place her with a relative or nonrelative extended family member on prior notice to her counsel.

3. *Jurisdiction and Disposition*

In its original April 2021 jurisdiction and disposition report, the Agency recommended that the court make a true finding on the petition's allegations and declare K.F. a dependent of the court. It reported receiving a copy of K.F.'s birth certificate, which identified Father as her father. Mother continued to deny that she used drugs or needed any services.

During a telephone interview, Father told the Agency that not only was he K.F.'s father, but that K.F. knew he was her father. He had been sending

3

Mother $200 per month, but had recently stopped doing so because he did not know where the money went. He reportedly had a video chat with K.F. three weeks earlier, and claimed Mother threatened that if he did not send the money she requested he could not speak with K.F. Father stated that he could provide care for K.F. and wanted her placed with him. He also reported that his parents resided in San Diego, but that Mother rarely allowed them to see K.F. Father said he could provide care for K.F. and wanted her placed with him.

At the May jurisdictional and dispositional hearing, the court declared Father to be K.F.'s presumed father pursuant to Family Code section 7573 and set the matter for a contested hearing at the request of Mother and S.P.

As discussed in the Agency's early July addendum report, Mother reported that she and S.P. had completed parenting classes and that she visited K.F. daily. The Agency submitted referrals to the international liaison office for Father. Father had two supervised virtual visits with K.F., who appeared engaged with him. In its late July addendum report, the Agency stated that Mother had recently tested positive for amphetamines and methamphetamine, but continued to deny drug use. At the ensuing jurisdictional hearing, the court made a true finding on the petition's allegations and continued the matter for a contested dispositional hearing.

In its October addendum report, the Agency recommended that the court place K.F. with Father and then terminate its dependency jurisdiction. When an Agency social worker asked K.F. about Father, she replied that she did not want to move to the Philippines with Father and instead wanted to live with S.P. K.F. could not remember her previous visit with Father in the Philippines, and she spoke only a few words in Tagalog. When on another occasion the social worker asked K.F. about possibly living with Father, she

4

replied that she would "miss [Mother] and [S.P.] and [her] sisters." During a drawing activity the social worker asked her to perform, K.F. expressed that she wished a good life for her sisters because they needed help when Mother was not there. According to K.F., she did not know whether she would like to visit Father or live with him.[4]

Father continued to request that K.F. be placed with him. He submitted proof that he had no criminal record and provided a negative drug test. He had a home, his own construction business, and could financially support K.F. and send her to a private Catholic school within walking distance of his home. Father stated he could add K.F. to his health insurance plan. His support system included his aunt, who lived next door and cared for his son, and his partner of six years who knew K.F.

The social worker conducted a video interview with Father and observed that Father's home was clean, well furnished, and had a separate bedroom for K.F. During his weekly video visits with K.F., Father told her he loved and missed her, and she told him she loved and missed him too. When he asked K.F. about possibly living with him in the Philippines, she stated she did not want to go there and that Mother had told her that. K.F. also said she would miss her sisters.

The social worker commented that K.F. was very knowledgeable about her sisters' daily routine (e.g., what they liked and did not like to eat and when they needed diaper changes). She appeared to have a sense of responsibility toward her sisters and was, in the social worker's opinion,

---

[4]    K.F. also told the social worker that a long time ago, the maternal great-aunt had hit her feet with a hanger. The maternal great-aunt admitted to the social worker that she had tapped K.F.'s feet because she was not listening and going to sleep and the maternal great-aunt was remorseful about it. She agreed to a service referral to learn how to redirect K.F.

"parentified," playing "more of a parental role than a sisterly role" in her sisters' lives. K.F. grew up in the traditional Filipino culture, as did Father. She did not treat him as a stranger, nor did she demonstrate any concerning behaviors after her video visits with him.

At the October 4 contested disposition hearing, the court authorized conjoint therapy for Father and K.F. and then continued the matter until November 4 at the request of K.F.'s counsel.

The Agency's November addendum reported that K.F.'s therapist described her as very parentified and diagnosed her with an adjustment disorder with mixed disturbance of mood and conduct. Mother's parent care counselor indicated that Mother would soon graduate from that program and had expressed her intention to attend aftercare classes. In another addendum report a month later, the Agency stated that Father had not received many of his visits with K.F. and was concerned that Mother had prevented K.F. from having contact with his family. The social worker reminded the maternal great-aunt of the importance of K.F.'s visitation with Father. K.F.'s therapist reported that Mother and the maternal great-aunt did not appear to be invested in the process during family sessions. The Agency had not yet received the results of Father's home study.

4. *Contested disposition hearing*

At the contested disposition hearing held on November 4 and December 17, the court admitted in evidence the Agency's original jurisdiction and disposition report, its addendum reports, a sibling bonding study by psychologist Raymond Murphy, Ph.D., and other documentary evidence. It heard live testimony from Priscilla Villafana, Agency's social worker, and Dr. Murphy. It also admitted in evidence the stipulated testimony of Mother, K.F., and Father.

In her stipulated testimony, Mother stated that she had negative drug tests since May 13. She had graduated from the parent care program on October 21 and would begin aftercare in November.

In her stipulated testimony, K.F. explained that she had two fathers, Father and S.P. She said she did not want to live with Father in the Philippines. Instead, she wanted to live in San Diego with Mother and her sisters. If she were unable to continue living with her sisters, she would cry and lock herself in her room. K.F. stated that if she were separated from her sisters, she would miss them "[l]ike, a trillion." K.F. also stated that if she were unable to live with Mother or S.P., she would be sad, cry, and lock herself in her room.

In his stipulated testimony, Father said he knew K.F. had a close attachment to her siblings and family in the United States and that, if she were placed with him, she would need to maintain contact with them. He planned to provide her with an iPad to allow her to have video calls with them. Before Mother began her relationship with S.P., he had daily video calls with K.F. After Mother moved in with S.P., however, Father was unable to speak with K.F. as frequently. When she visited the Philippines in 2016, he was able to see her only when she was with her maternal relatives.

Dr. Murphy is a forensic psychologist who specializes in conducting bonding studies. In his September 2021 report, he described his assessment of the bonds and attachments between K.F. and her siblings based on his two and one-half hour observation. He did not, however, review the Agency's reports, speak with Agency social workers, or obtain a history of K.F. and her family. In his report, Murphy opined that K.F. and Aa.P. appeared to have a "significant sibling relationship." Both K.F. and Aa.P. expressed love and affection for their baby sister, Au.P. K.F. also seemed to have significant

relationships with extended family members both in the home and outside the home. Murphy described both K.F. and Aa.P. as "well bonded."

Dr. Murphy concluded that K.F. had an "average relatively strong sibling bond" with her sisters. In particular, he stated that K.F. and Aa.P. "are quite well attached to each other." K.F.'s relationship with Au.P. was developing and her bonding with Au.P. was that expected between an older person and an infant. If K.F. were separated from her siblings by moving to the Philippines, Murphy believed the separation would have a traumatic effect, which could be detrimental to K.F.'s emotional or psychological well-being. In addition, if K.F. ceased to have contact with her maternal relatives, she would suffer some trauma and it could affect her long-term development. The likelihood of an adverse impact on K.F. from separation from her siblings and maternal relatives would be contingent on whether the separation allowed for a transition with intervention. Such intervention could reduce any trauma from the separation. He testified that if there was a careful transition for K.F., her trauma from a move away from her siblings and relatives could be overcome because she has resilience.

Villafana testified that she had been assigned to K.F.'s case since March. It was her opinion that K.F. could not safely return home with either Mother or S.P. because Mother had substance abuse issues, which she continued to deny, and had only recently attained sobriety. She recommended that K.F. be placed with Father in the Philippines because he was the noncustodial and nonoffending parent and had been a part of her life since her birth. Villafana did not have any information showing that Father was not able to safely parent K.F. Father's parents resided in San Diego and K.F. knew them.

Villafana understood that K.F. did not want to live with Father, but believed she did not have the maturity to make a decision on where to live. She acknowledged K.F.'s primary concern was that she would miss her sisters. In Villafana's opinion, however, there were ways to minimize K.F.'s trauma if she moved to the Philippines. She also thought Father was sensitive to K.F.'s need to maintain a connection with her sisters and other San Diego relatives. Because K.F. had adapted well to living with the maternal great-aunt, Villafana believed she could also adapt to living with Father.

Villafana made her recommendation despite having read Dr. Murphy's report. She had known K.F. for months and observed K.F.'s tendency to be her sisters' caregiver and worry about them. She was concerned that Murphy had observed K.F. for only a matter of hours.

Villafana believed K.F. was parentified, but this did not prevent her from being bonded with her sisters. K.F.'s parentification meant that she interacted with her sisters as someone worried about their well-being and not as someone who played with them. Villafana stated that K.F. was in therapy because of her parentification.

K.F. had not had any contact with her family in the Philippines since she was three years old, and the Agency was still waiting for Mother to provide K.F.'s passport so that she could visit Father. As a result, K.F. knew her San Diego family members far better than her family members in the Philippines. Villafana agreed it was fair to state that Father did not yet have a parental relationship with K.F.

The juvenile court found, by clear and convincing evidence, that K.F. should be removed from Mother and S.P. based, among other things, on Mother's methamphetamine addiction and her failure to acknowledge it. But

9

rejecting the Agency's recommendation, it also decided that it would be detrimental to K.F. to place her with Father. In reaching this latter conclusion, the court relied on precedent that found emotional detriment when a child was separated from siblings and forced to live out-of-state with a noncustodial, nonoffending parent. It explained that K.F. was "unusually bonded to her sisters," was preoccupied with their welfare, and was concerned whether she could stay with and help them. The court concluded the circumstances in K.F.'s case were more like those in *In re Luke M.* (2003) 107 Cal.App.4th 1412 (*Luke M.*) rather than *In re C.M.* (2014) 232 Cal.App.4th 1394 (*C.M.*).

In the court's view, K.F. and her sisters had forged a bond via shared trauma, and that her bond with Aa.P. was a "bond of survival" similar to that of the children in *Luke M.* It explained that the traumas K.F. and her siblings experienced "have forced them to be closer than children of their ages normally are." Although K.F. had been described as parentified and her sibling bond had some unhealthy aspects, the bond was "nonetheless a strong one" that was "stronger than typical."[5]

The court also noted that K.F. suffered from an adjustment disorder that made her "more fragile" than other children. It believed it would be an "intense disruption" for K.F. to be placed with Father in another country against her wishes. Such a move, in the court's view, would place her long-term happiness and mental health at risk. The court also noted that it would make little sense to remove her from a placement that was working if she could reunify with Mother and S.P. within a few months.

---

[5] Because Dr. Murphy had not reviewed the Agency's reports and did not know K.F.'s case history, the court did not find his bonding assessment particularly helpful on that point.

Accordingly, the court ordered that K.F. be removed from the custody of Mother and S.P. and remain in her current placement in the approved home of a relative (i.e., the maternal great-aunt and great-uncle). It also directed that reunification services be provided to Mother and S.P., and that Father be provided with visitation.

Father appeals the dispositional order, challenging the juvenile court's decision not to place K.F. with him.[6]

DISCUSSION

1. *Applicable Legal Principles*

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) The court has broad discretion in choosing an appropriate

---

[6] While this case was being briefed, the Agency filed a request that we take judicial notice of the juvenile court's April 27, 2022 minute order and subsequently filed another request that we take judicial notice of the juvenile court's June 15, 2022 minute order. We issued orders stating that we would consider those requests concurrently with this appeal. Because the April 27, 2022 and June 15, 2022 minute orders were issued *after* the December 17, 2021 dispositional order which is the subject of this appeal, we deny both requests for judicial notice. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); *In re Zeth S.* (2003) 31 Cal.4th 396, 405 [appeal reviews correctness of judgment or order as of time of its issuance]; *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [appellate court generally will consider only matters which were part of record at time judgment was entered]; cf. *In re N.S.* (2016) 245 Cal.App.4th 53, 58 [parties should forward postappeal rulings by juvenile court when they affect appellate court's ability to grant effective relief or may play proper role in consideration of appeal's merits].) In so doing, we note that the Agency has not filed a related motion to dismiss the appeal based on mootness or otherwise shown the juvenile court's subsequent minute orders affect our ability to grant effective relief or are otherwise relevant to our consideration of this appeal. (*Id.* at p. 58; Cal. Rules of Court, rule 8.252(a)(2)(A).)

11

disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) Before physically removing a child from his or her parent, the court must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means to protect the child without such removal. (§ 361, subd. (c)(1); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) Furthermore, if at the dispositional hearing the court removes the child from the care of the custodial parent pursuant to section 361, section 361.2 requires the court to place the child with the noncustodial parent unless such placement would be detrimental to the child.[7] (§ 361.2, subd.(a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 453 (*Zacharia D.*).)

By its terms, section 361.2 generally applies only at a dispositional hearing after a child has been removed from the care of the custodial parent. (*Zacharia D., supra*, 6 Cal.4th at p. 453.) To qualify as a noncustodial parent, an alleged or biological father must also obtain status as a presumed father. (*Id*. at p. 454.) "To comport with due process, the detriment finding [under section 361.2, subdivision (a)] must be made under the clear and convincing evidence standard." (*C.M., supra*, 232 Cal.App.4th at p. 1401.)

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm. [Citation.] Sibling relationships are clearly a relevant consideration in evaluating a child's

---

[7]    Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . ."

emotional well-being.  Thus, under the statutory scheme governing postremoval placement decisions, a detriment finding can properly be supported by the emotional harm arising from the loss of sibling relationships even in the absence of the noncustodial parent's contribution to the detriment."  (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.)  The relevant factors in making a detriment evaluation may include the child's wishes, the child's bond with their siblings, and the child's relationship with the noncustodial parent.  (*C.M.*, *supra*, 232 Cal.App.4th at p. 1402.)  No single factor is dispositive.  (*Ibid.*; *In re Adam H.* (2019) 43 Cal.App.5th 27, 33 (*Adam H.*).)

On appeal, we review the record for substantial evidence to support the juvenile court's dispositional findings and order, bearing in mind the heightened requirement of proof by clear and convincing evidence.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154-155 (*V.L.*); *Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.)  We must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; see also *V.L.*, at pp. 154-155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under § 361, subd. (c)]; *Luke M.*, at p. 1426.)

In applying the substantial evidence standard of review, we "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; see also, *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)  A finding is supported by substantial evidence if a trier of fact could reasonably make

that finding in light of the entire record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823 (*Manuel G.*); *N.M.*, *supra*, 197 Cal.App.4th at p. 168.) On appeal, the parent has the burden to show there is insufficient evidence to support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *N.M.*, at p. 168.)

2. *Substantial Evidence Supports the Court's Section 361.2 Detriment Finding*

Father contends there was no substantial evidence to support the juvenile court's finding that it would be detrimental to K.F.'s emotional well-being under section 361.2 to place her with him after it removed her from the custody of Mother and S.P. In particular, he relies on the evidence showing that he could safely parent K.F. He contends the circumstances in this case are more like those in *C.M.* rather than *Luke M.*, and that there is insufficient evidence to support a finding that K.F.'s bonds with her siblings and other San Diego relatives were such that she would suffer detriment if placed with him.

Although the Agency recommended that the juvenile court place K.F. with Father in the Philippines, it now argues—and K.F.'s counsel joins in its argument—that there is substantial evidence to support the court's detriment finding. Based on our review of the record, we conclude there is substantial evidence to support the court's finding, by clear and convincing evidence, that it would be detrimental to place K.F. with Father.

At the outset, we note that the record shows Father could safely parent K.F. The undisputed evidence indicates that (1) Father consistently showed an interest in K.F. throughout her life; (2) he had his own construction

14

business that was adequate to financially support K.F.; (3) there was no criminal or drug abuse history; (4) he had a clean and well-furnished home with a separate bedroom for K.F.; and (5) he had a family support system that could help him raise a child. Based on our review of the record, we have no doubt that Father loves K.F. and could safely and adequately parent her.

But to place a child with a noncustodial parent, section 361.2 requires more than merely someone who can safely and adequately parent. The statute also requires the *absence* of a finding by the court "that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Alternatively stated, if the court finds that placement of a child with a noncustodial parent who could safely and adequately parent the child would nevertheless detrimentally affect the emotional well-being of the child (i.e., the child would suffer a net harm), then the child should be placed elsewhere. (§ 361.2, subd. (a); *Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.) Importantly, the detriment to the child need not be the fault of the noncustodial parent.

Here, contrary to Father's argument, there is substantial evidence to support the court's finding that K.F. would suffer detriment within the meaning of section 361.2, subdivision (a) if she were placed with him in the Philippines. First, K.F. repeatedly stated that it was her wish to stay with her siblings in San Diego and not to live with Father in the Philippines. Although K.F. is eight years old and her placement wishes are not dispositive, the court nevertheless could—and properly did—consider her wishes along with other relevant factors in evaluating detriment in placing her with Father. (*C.M.*, *supra*, 232 Cal.App.4th at p. 1402; *Adam H.*, *supra*, 43 Cal.App.5th at p. 33.) And she consistently expressed her opposition to

15

the proposed move in terms that reflected serious concerns for a child of her age.

Second, the evidence supports the court's finding that K.F. had an unusually "strong" bond with her siblings, particularly Aa.P. The court noted that K.F. and her sisters had forged a bond via shared trauma and that her bond with Aa.P. was a bond of survival similar to that of the children in *Luke M.* It further observed that although K.F. was apparently parentified and her sibling bond had some unhealthy aspects, it was "nonetheless a strong one" and "stronger than typical." Father does not cite, and we are unaware of, anything in the language of section 361.2, subdivision (a), or in case law interpreting detriment under that statute limiting a juvenile court's consideration of a child's sibling bonds to only those bonds that are considered "normal" or "healthy." Rather, in considering all relevant factors, we conclude a juvenile court may, as the court presumably did here, consider all types of bonds a child may have with others in determining whether she will suffer detriment if those bonds are substantially impaired.

Here, K.F. stated that if she were separated from her siblings she would miss them, cry, and lock herself in her room. When asked how much she would miss her siblings if she moved to the Philippines, K.F. answered, "[l]ike, a trillion." Social worker Villafana understood K.F.'s feelings, explaining that she had a tendency to be her sisters' caregiver and worried about them. Dr. Murphy opined that if K.F. were separated from her siblings, it would have a traumatic effect on her. He said K.F. had an "average relatively strong sibling bond" with her sisters, explaining that same gender siblings generally showed stronger attachments than different gender siblings. Thus, in this case the court could reasonably conclude that K.F. had a strong, albeit largely parentified, bond with her siblings such that

16

her emotional well-being would be detrimentally affected if she were separated from her siblings and placed with Father in the Philippines.

There was also evidence to support a finding that K.F.'s emotional well-being would further suffer if she were separated from her other San Diego relatives, which include Mother, S.P., her maternal great-aunt, and other maternal and paternal relatives who reside in the San Diego area. In particular, in her stipulated testimony K.F. stated that if she were unable to live with Mother or S.P., she would be sad, cry, and lock herself in her room. Also, Dr. Murphy testified that if K.F. ceased to have contact with her maternal relatives, she would suffer some trauma and it could be problematic.

Finally, the court could also reasonably infer that K.F.s' diagnosis of an adjustment disorder with mixed disturbance of mood and conduct would further exacerbate the emotional detriment she would suffer if she were removed from her San Diego home and placed in a wholly different environment thousands of miles away with a father she knew primarily through video calls.[8] Assuming, as Dr. Murphy suggested, that K.F.'s

---

[8]     In support of his assertion that evidence of K.F.'s diagnosis cannot provide support for the court's detriment finding, Father quotes our language in *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 (*Patrick S.*): "[The child's] anxiety and diagnosis of adjustment disorder, unspecified, does not support a detriment finding without a showing that [the noncustodial parent] would not be willing or able to obtain recommended therapeutic services for him." We do not interpret our language in *Patrick S.* as establishing a general rule that juvenile courts can only consider an adjustment disorder diagnosis in making detriment findings if there is evidence showing that the noncustodial parent would not obtain therapy for the child. Rather, that language should be construed as concluding the child's adjustment disorder, by itself, could not provide substantial evidence to support the detriment finding in the circumstances of that case. Absent expert testimony or other authority, we are reluctant to conclude that an adjustment disorder can

trauma from such a move could be reduced through a careful transition and proper intervention, the court could nevertheless consider the detriment to her emotional well-being that the move could cause.

Contrary to Father's apparent assertion, the fact that the Agency recommended that K.F. be placed with Father did not preclude the court from finding she would suffer detriment from such a placement, nor does it show there is insufficient evidence to support the court's detriment finding. The juvenile court can reach conclusions different than the Agency to the same extent it can reject any other expert opinion. (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 10 [juvenile court "is . . . free, of course, to disregard the recommendations of the social services agency"].) Furthermore, to the extent Father points to evidence or inferences that would have supported a finding that K.F. would not suffer detriment from placement with him, he misconstrues and/or misapplies the substantial evidence standard of review. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996; *V.L.*, *supra*, 54 Cal.App.5th at p. 154.) We do not consider the credibility of witnesses or reweigh the evidence, and must affirm an order that is supported by substantial evidence even if other evidence would have supported a contrary finding. (*Manuel G.*, *supra*, 16 Cal.4th at p. 823; *N.M.*, *supra*, 197 Cal.App.4th at p. 168; *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780.)

Contrary to Father's assertion, we conclude that the juvenile court correctly considered the circumstances in this case to be closer to those in *Luke M.* than to the ones in *C.M.*. In *Luke M.*, *supra*, 107 Cal.App.4th 1412, we concluded there was substantial evidence to support the juvenile court's dispositional order placing the children with their paternal aunt and uncle,

---

always be managed with therapy so that a child with such a diagnosis could never suffer emotional distress from being separated from siblings and other family members with whom the child has strong bonds.

rather than with their noncustodial father, based on its finding the children (who were eight and 10 years old) would suffer detriment if placed with him in Ohio and separated from their siblings. (*Id*. at pp. 1425-1427.) As we explained:

> "The record amply supports a finding that there was a high probability that moving to Ohio would have a devastating emotional impact on [the children]. They depended on their siblings for love, support, and security. Since their removal, their only request of the social worker was not to be separated. They cried and became depressed when she spoke with them about the possibility of separating." (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.)

We likewise approved the juvenile court's consideration of the children's wishes regarding their placement, as well as the fact that they had lived with their siblings for their entire lives and had "come to rely on each other" during the disruption their lives had experienced during previous dependency proceedings. (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.) In that case, the social worker had concluded the children were very bonded with their siblings who were staying in California and would suffer detriment if they were placed with their father in Ohio. (*Ibid*.)

By contrast in *C.M.*, *supra*, 232 Cal.App.4th 1394, the child wanted to remain living with her maternal grandparents and did not want to live with her father, with whom she had regular weekend visits. In particular, she did not want to be separated from her younger sibling or change schools. (*Id*. at pp. 1397-1398, 1402.) The agency recommended, and the juvenile court ordered, that custody of the child be taken from her mother and that she be placed out of the home but not with her father. (*Id*. at pp. 1399-1400.) On appeal, the appellate court in *C.M.* held there was insufficient evidence to support a finding that placement of the child with her father would be detrimental to her under section 361.2, subdivision (a). (*Id*. at pp. 1400-

19

1402.) It concluded that the child's wish to remain with the maternal grandparents and her lack of an established relationship with her father was insufficient evidence to support a detriment finding. (*Id*. at p. 1403.)

Importantly for purposes of this case, *C.M.* distinguished its circumstances from those in *Luke M.*:

> "[T]he evidence of detriment from separating C.M. and [her sibling] was nowhere near as strong as that in *Luke M.* First, C.M. was not being moved halfway across the country, as were the children in *Luke M.* Second, there was no evidence that the bond between C.M. and [her sibling] was any greater than the normal sibling bond, in contrast to *Luke M.* where the relationship among the siblings 'was much closer than in normal sibling relationships.' [Citation.] Finally we observed that father offered to have [the sibling] live in his home, and there was nothing to suggest he would not foster an ongoing relationship between siblings." (*C.M.*, *supra*, 232 Cal.App.4th at p. 1404.)

Accordingly, *C.M.* reversed the court's detriment finding and remanded the matter for a new dispositional hearing on the issue of placement of C.M. with her father. (*C.M.*, *supra*, 232 Cal.App.4th at pp. 1404-1405.)

Here, the juvenile court could properly conclude that the circumstances here were more similar to those in *Luke M.* K.F. was clearly bonded with her siblings and their relationship reflected more than the average sibling bond. Instead, as the juvenile court noted, past trauma in their lives had created a bond of survival between them. As the oldest sibling, K.F. had formed a bond similar to that of a parent to a child. She was very concerned with her siblings' welfare, especially when Mother was sleeping, and often assumed responsibility for feeding them. If she were separated from her siblings, K.F. stated that she would miss them "[l]ike, a trillion," cry, and lock herself in her room. Not surprisingly, Dr. Murphy testified that if K.F. were separated

20

from her siblings, it could have a traumatic effect on her. Based on this evidence, the court found that K.F.'s bond with her siblings was "*stronger than typical.*" (Italics added.)

K.F.'s bond to her siblings and the emotional detriment she likely would suffer if separated from them approaches the nature of the sibling relationships in *Luke M.* Moreover, the geographic separation in this case exceeds that in *Luke M.* While the children in *Luke M.* would have been separated from their siblings by more than two thousand miles—the distance between California and Ohio—K.F. would be separated from her siblings by an ocean and nearly 7,500 miles if placed with Father in the Philippines, making it that much more difficult for her to maintain the close bond she has with her siblings.

To the extent Father cites other cases, they arguably provide support for the court's detriment finding and, in any event, do not persuade us to conclude there is insufficient evidence to support its finding. (See, e.g., *In re A.C.* (2020) 54 Cal.App.5th 38, 41-43 [detriment finding affirmed because evidence showed child lost sleep and suffered fear and anxiety about possibility of being placed with noncustodial father and assessment team believed child was at high risk of emotional deterioration from such placement]; *In re John M.* (2006) 141 Cal.App.4th 1564, 1570-1571 [child's need of services for his cognitive difficulties, oppositional and aggressive behavior, serious emotional disturbance, and attention deficit hyperactivity disorder did not, by itself, provide substantial evidence to support detriment finding].)

Finally, Father suggests that K.F. also suffered some level of detriment from the maternal great-aunt's behavior (e.g., messy home, occasionally being overwhelmed in caring for K.F., lack of engagement in K.F.'s therapy, hitting

21

K.F. with clothes hanger, interference with Father's video visits with K.F.). Assuming arguendo the truth of this assertion, this balancing-of-detriments argument does not show there was insufficient evidence to support the court's finding that K.F.'s placement with Father in the Philippines would, on balance, be detrimental to her emotional well-being. We must presume the court considered all relevant factors, including the maternal great-aunt's behavior, in making its detriment finding, even though it did not expressly discuss every point raised by each of the parties.

DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.